# CHICAGO, ROCK ISLAND AND PACIFIC RAILWAY COMPANY *v.* DENVER AND RIO GRANDE RAILROAD COMPANY.

# DENVER AND RIO GRANDE RAILROAD COMPANY *v.* CHICAGO, ROCK ISLAND AND PACIFIC RAILWAY COMPANY.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF COLORADO.

Nos. 1095, 1109. Submitted January 7, 1892. — Decided March 7, 1892.

In the interpretation of any particular clause of a contract, the court is required to examine the entire contract, and may also consider the relations of the parties, their connection with the subject matter of the contract, and the circumstances under which it was made.

The Chicago, Rock Island and Colorado Railway Company contracted with the Denver and Rio Grande Railroad Company for the use by the former of the tracks, stations, sidings, switches, etc. of the latter company between Colorado Springs and Denver, (except its shops at Burnham), and also for its terminal facilities at Denver, and, having so contracted made its connections and entered on the enjoyment of its rights under the contract. Shortly afterwards the Chicago, Rock Island and Pacific Railway Company was organized and acquired the property and rights of the Chicago, Rock Island and Colorado Railway and entered into the enjoyment of them, and its rights were recognized by the Denver and Rio Grande Railroad Company. The Rock Island and Pacific Company then acquired a right to connect with the Union Pacific Railroad

Company at Limon, and to run its eastern trains over the tracks of the latter company to Denver, which it did. The distance from Limon to Denver by this route was sixty-four miles less than by the way of Colorado Springs and the Denver and Rio Grande road. Although it had diverted its Denver traffic, it continued to use the Rio Grande road for its Pueblo traffic, and it claimed the use of the terminal facilities of that road at Denver for all, and also the use of some land at Burnham not actually used for shops. It also claimed the right under the contract to put in its own switching forces and cleaning gangs. The Denver and Rio Grande Company then gave notice that it would exclude from the Denver terminals all business coming over the Union Pacific tracks. Thereupon the Rock Island Company filed a bill in equity and obtained a restraining order. By amendments and supplemental bills there were brought into the controversy other matters of difference between the two companies and a final decree was made settling their rights under the contract as follows: (1), that the new Rock Island Company was the successor of the old, and had the right under the contract to operate its trains over the Rio Grande Company's line; (2), that it had not the right, under the contract, to bring its trains to the Denver terminals over the Union Pacific; (3), that it had the right to employ separate switching crews and separate employés to perform other services in the yards of the Rio Grande Company under the control and subject to the direction of the agent of that company; (4), that the words " shops at Burnham " in the contract included all lands used or procured for shop purposes and appurtenant to the shops located at Burnham; (5), that a track should be set apart at Denver on which the Kansas Pacific Company might clean its cars; (6), that each party should pay one-half of all costs. On appeal this court *Held,*

(1)  That the plaintiff was entitled to file this bill;

(2)  That it was never intended to grant the use of terminal facilities for the Rock Island road, except as appurtenant to the use by it of the Rio Grande road;

(3)  That the exception of the shops at Burnham not only included the buildings actually used for mechanical purposes, but also two tracts purchased for the use of the shops, and intended to be devoted to such purposes;

(4)  That there was no error in the decree of the court below as to the employment of separate switching crews;

(5)  That the cleaning of the cars could be done by the Rock Island Company, but the Rio Grande Company was bound to furnish track facilities for it;

(6)  That it was not necessary to decide questions raised as to the discharge of employés engaged in the operation of that part of the road jointly occupied and used under the contract.

THE court stated the case as follows:

This was a bill in equity brought by the Chicago, Rock

Island and Pacific Railway Company, (hereafter designated as the Rock Island Company,) against the Denver and Rio Grande Railroad Company, (hereinafter designated as the Denver Company,) to enforce an alleged right to certain terminal facilities at the city of Denver, and for certain incidental purposes, hereinafter stated in the opinion. There was also a cross-bill filed to enjoin the plaintiff from making use of such facilities, and for other purposes, which was subsequently dismissed by stipulation of the parties.

The litigation arose out of a contract entered into on the 15th day of February, 1888, between the Denver Company and the Chicago, Rock Island and Colorado Company, (hereinafter designated as the Chicago Company,) for the joint use and possession of the Denver road between Denver and Pueblo, the material portions of which are printed in the margin.[1]

---

[1] *Material portions of the contract of February* 15, 1888. .

Articles of agreement made and entered into this fifteenth (15th) day of February, in the year eighteen hundred and eighty-eight, by and between the Denver and Rio Grande Railroad Company, a corporation organized and existing under the laws of the State of Colorado, hereinafter referred to as the " Denver Company," and the Chicago, Rock Island and Colorado Railway Company, a corporation organized and existing under the laws of the same State, hereinafter referred to as the " Chicago Company," witnesseth:

First. The Denver Company owns and operates a railway with appurtenant property, a portion of the main line of which extends from Denver through Colorado Springs to South Pueblo, all in the State of Colorado; and the Chicago Company owns a railway which is being constructed from the western boundary of the State of Kansas, at which point it will connect with the Chicago, Kansas and Nebraska Railway to the city of Colorado Springs, above mentioned.

Second. The interest of both parties and of the public will be promoted by the establishment and operation of a through line of railway between all the points of the railway of the Denver Company between and including Denver and South Pueblo, and all points on the line of railway which will be operated by the Chicago Company, and on the system of railways of which the Chicago Company will form a part.

Therefore, in consideration of the premises and of the several covenants, promises and agreements hereinafter set out, the parties do covenant, promise and agree to and with each other as follows:

Article I.

The Denver Company covenants, promises and agrees to and with the Chicago Company: .

Pursuant to art. III, § 10, of this contract; the president of the Chicago Company, on March 17, 1888, gave written

SECTION 1. It hereby lets the Chicago Company into the full, equal, joint and perpetual possession and use of all its tracks, buildings, stations, sidings and switches on and along its line of railway between and including Denver and South Pueblo, excluding its shops at Burnham, meaning and intending hereby to include in the description aforesaid all and every portion of its railway, and appurtenant property, between and at the points aforesaid, and all improvements and betterments thereof and additions thereto, which may be jointly used by the parties, as hereinafter provided.

SEC. 2. It will maintain and keep in good repair the property described in the preceding section, during the term of this contract, and will comply with all regulations prescribed by law for the safety of the public.

SEC. 3. It will, if required by the Chicago Company, provide the necessary housing and care of the locomotives which said party may have from time to time at Denver and South Pueblo, upon reasonable terms, which shall be agreed to by the general managers or other authorized officers of the two companies. It will, upon like requisition, furnish in the same manner it provides its own locomotives on its tracks above described, all water and coal which the Chicago Company will need for the operation of its trains over the railway of the Denver Company. The compensation which shall be paid for the water supply shall be ascertained on the basis of wheelage as hereinafter provided for expenses of maintenance and repairs; and the compensation for coal so furnished shall be the actual cost thereof in the shutes and platforms from which it is transferred to the locomotives of the Chicago Company. . . .

SEC. 4. It will pay all taxes and assessments which shall be levied or assessed directly or indirectly upon or against the property described in article 1, section 1, hereof, or upon either the gross or net earnings thereof during the term of this indenture.

SEC. 5. It will at the commencement of said term, if so required by the Chicago Company, provide, and, during the continuance thereof, maintain, at Denver and South Pueblo, for the exclusive use and control of said Chicago Company, engine-houses conveniently located and having the necessary fixtures and sufficient capacity to properly and safely shelter all locomotive engines which said company may have occasion to use on the railway of the Denver Company. . . . .

### Article II.

The Chicago Company covenants, promises and agrees with the Denver Company as follows:

SECTION 1. It hereby accepts the covenants, promises and agreements made and entered into by the Denver Company.

SEC. 2. It will, from and after the completion of its railway from the boundary line of the State of Kansas to a connection with the railway of

notice to the defendant company that the Chicago Company elected, as provided by the contract of February 15, 1888, " to

the Denver Company at or near Colorado Springs, while this agreement remains in force, pay monthly for the use of the premises described in article 1, section 1, hereof, the sum of the following amounts:

First. An amount equal to a one-twelfth part of two and one-half per centum of the value of the property described in article 1, section 1, hereof, and which value it is agreed is three million dollars; . . .

Second. An amount equal to a one-twelfth part of two and one-half per centum per annum upon all sums which the Denver Company shall from time to time pay for the construction or acquisition of additional tracks, facilities and conveniences under section 1, article 3, hereof, except round-houses at Denver and Pueblo.

Third. An amount equal to a one-twelfth part of five per centum upon the cost of constructing, and in addition thereto the cost of repairing round-houses which the Denver Company may erect and maintain at Denver and South Pueblo, for the exclusive use of the Chicago Company, as provided in section 5, article 1, hereof.

Fourth. An amount equal to the proportion of the cost or expenses actually incurred and paid during the month for keeping the railway and appurtenant property described in the first section of article 1, hereof, in repair, and supplying it (the Chicago Company) with water, as the number of wheels per mile run by it, the Chicago Company, over said railway, or any part thereof, bears to the whole number of wheels per mile run over the same during the same period.

Fifth. An amount equal to the actual cost of the coal delivered during the month to the engines of the Chicago Company under this contract.

Sixth. An amount equal to a proportional share of the expenses actually incurred in paying proper salaries to the general superintendent and subordinate employés, including switchmen, telegraph operators, train dispatchers, and others, necessarily employed in the performance of the duties incident to the joint use and occupation of said railway, not including trainmen, which proportion shall be ascertained in the manner provided in paragraph number four, above set out.

Seventh. An amount equal to one-half of all taxes and assessments lawfully levied and actually paid during the month upon the property described in article 1, section 1, hereof; that is, that portion of the railway and appurtenant property used by the Chicago Company under this contract, excluding shops at Burnham, and equipments, facilities and conveniences not intended for joint use by the parties hereto. . . .

Tenth. No compensation will accrue or be paid to the Denver Company from or by the Chicago Company, for the use and occupation of said premises before the railway of the Chicago Company shall be completed from its initial point on the western boundary of the State of Kansas to a connection of the railway of the Denver Company within the time hereinafter specified.

build its railway from the western boundary of the State of Kansas to Colorado Springs, and that it will have the same

---

Eleventh. The cost of operating and maintaining all tracks, structures and facilities used jointly by the Denver Company and the Chicago Company shall be apportioned between said companies on a wheelage basis. . . . Said Denver Company shall receive from the Chicago Company such a portion of the expenses incurred by the Denver Company in operating and maintaining the railway between Denver and Pueblo operated and maintained by the Denver Company, which shall be as the entire wheelage of the Chicago Company is to the entire wheelage on said railway between Denver and Pueblo.

SEC. 3. It is legally incorporated and has power to construct, maintain and operate a railway which will extend from the western boundary of the State of Kansas to Colorado Springs, in the State of Colorado, and to make and perform on its part the several covenants, promises and agreements in these articles contained. . . .

### Article III.

SECTION 1. If the Chicago Company shall at any time during the continuance of the term of this indenture deem any additional side-tracks or double tracks between said Denver and South Pueblo, or along any portion of the line of railway between said points, essential or necessary, it shall call upon the Denver Company to construct the same upon reasonable notice. . . .

The Chicago Company shall pay monthly, as compensation for the use of the same, one-twelfth of two and a half per centum per annum of the cost of such construction, as is provided in article 2, section 2, and its share of maintenance thereof based on wheelage, as provided in said section.

If additions are made by the Denver Company to its terminal facilities at Denver or South Pueblo, by the building of additional tracks, the Chicago Company shall have the right and privilege to occupy and enjoy equal use of the same, if it shall so elect, and if it shall so elect then it shall from the time of such election pay monthly to the Denver Company, as compensation for such use, one-twelfth of two and one-half per centum upon the cost thereof plus interest at two and one-half per centum per annum upon such cost from the time of construction until the date of such election in the manner provided in article 2, section 2, hereof, and its share of maintenance thereof, after such election, based on wheelage, as is provided in said article.

If the Chicago Company shall at any time during the continuance of the term of this indenture desire any side, spur, or other tracks, other than those above specified, connecting any track described in article 1, section 1, hereof, with its own tracks, or with the tracks of any other railway company, or to any industry, or shall desire any facilities or conveniences which do not now exist, it shall give to said Denver Company notice of

ready for operation on or before the thirty-first day of December, in the year one thousand eight hundred and eighty-nine."

such desire, and the said Denver Company may, within thirty days after receiving said notice, proceed to construct such tracks or acquire such facilities and conveniences; and the Chicago Company will pay for the use of the same, in monthly instalments, as provided in article 2, section 2, hereof, a sum equal to a one-twelfth part of two and one-half per centum per annum from the date of such construction or acquisition, upon the cost of constructing or acquiring such tracks, facilities and conveniences, and shall pay in addition thereto its share of the cost of the maintenance thereof, based on wheelage, as herein provided. If the Denver Company shall neglect or refuse to construct such tracks or acquire such facilities and conveniences within a reasonable time, the Chicago Company, at its own expense, in its own name, or in the name of some third person or corporation, as it may be advised, may construct or acquire the same, and it shall be the sole owner, and have the right to use and remove the same, or any part thereof, during the term of this indenture. . . .

SEC. 2. Schedules of rules and regulations for the movement of engines and trains over the railway described in article 1, section 1, hereof, shall be made from time to time by officers duly authorized by the parties. Such schedules shall, as nearly as may be practicable, accord equality of right, privilege and advantage to trains of the same class operated by both parties, and to trains of a superior class operated by either party, and a preference over trains of an inferior class operated by the other. All schedules of rules and regulations shall be reasonable and just to both parties, and shall secure to neither any unfair preference or discrimination against the other. They shall be executed and all trains shall be moved under the immediate direction of the superintendent, or other officer duly authorized, of the Denver Company. . . .

SEC. 3. Any employé of one company engaged in the operation of any part of the railway jointly occupied and used under this contract shall be removed from that portion of said line upon the request of the other.

SEC. 4. The Chicago Company will do no business as a carrier of persons or property between intermediate stations between Denver and Colorado Springs, or between intermediate stations between Colorado Springs and Pueblo, or between any such intermediate station and Denver, Colorado Springs, or Pueblo; but it shall have the right to transport persons and property between stations on its railway and connecting lines and all points between and including Denver and South Pueblo: provided, however, that if the Chicago Company shall at any time acquire by purchase, construction or otherwise a railway extending not less than fifty (50) miles from Pueblo, it shall have the right to transfer persons and property between any point on such line and Denver. . . .

. The Chicago Company will not permit any express company to do business on its trains to or from stations on the line of the Denver Company

Statement of the Case.

Soon after this, the Chicago Company completed its connection with the Denver Company's line at Colorado Springs, and thereafter for some time brought all its trains by the way of Colorado Springs, to Denver and Pueblo over the defendant's line. The distance from Denver to Pueblo is about 120 miles, Colorado Springs being an intermediate station, nearly midway between the termini.

---

between South Pueblo and Colorado Springs, or between stations between Colorado Springs and Denver, or from Denver to South Pueblo, or from South Pueblo to Denver. It may permit such a company or companies to carry property on its trains from Denver to Colorado Springs, from Pueblo to Colorado Springs, and to and from stations on its own railway and connecting lines to and from all points between and including Denver and South Pueblo. . . .

In the division between the parties hereto of joint rates on through traffic, including all transported by each party which shall pass through Pueblo or Denver to or from the railway of the Chicago Company at Colorado Springs, no difference between the hauls made by the parties respectively on the railway of the Denver Company between Denver and Pueblo shall be considered. For example, if the Denver Company receives through traffic from points beyond Denver or South Pueblo and hauls the same to Colorado Springs, and there delivers it to the Chicago Company it will receive no greater division of the through rate than it will receive for like traffic delivered at Denver and South Pueblo; and if the Chicago Company hauls through traffic destined to points beyond Denver or South Pueblo to said points, instead of delivering it to the Denver Company at Colorado Springs, it will receive no larger division of the through rate because of such additional haul. . . .

SEC. 9. This contract shall attach to and run with the railways of the respective parties during the corporate existence of each, and of all extensions of such existence, by renewal or otherwise; and shall be binding upon the lessees, assigns, grantees and successors of each during the continuance of their several corporate existences: provided, however, that the Chicago Company can assign its interests in this contract only by a sale, lease, or consolidation of its own property. . . .

SEC. 10. The Chicago Company shall, on or before the first day of April, in the year one thousand eight hundred and eighty-eight, notify the Denver Company whether or not it elects to build its line aforesaid from said point on the western boundary line of the State of Kansas to said Colorado Springs. If it shall elect to build said line it agrees to complete the same and to occupy the line of the Denver Company, and to be bound by the terms of this contract, on or before the 31st day of December, in the year 1889. If it shall elect not to build said line this contract shall, on the said 1st day of April, in the year 1888, become void and of no effect. .. . ..

In April, 1889, the Rock Island Company, claiming to be the successor in interest of the Chicago Company under the contract, assumed the operation of that company's line, and about the same time entered into a contract with the Union Pacific Company, by the terms of which the Rock Island Company acquired the right to connect its railway with that of the Union Pacific at Limon, about ninety miles east of Denver, and to run its trains over the track of the Union Pacific from that point to Denver, which was sixty-four miles shorter than that by Colorado Springs, and over a road the maximum grade of which was much less than the other. From that time to the present the plaintiff has transacted most of its business to and from Denver over the Union Pacific line, bringing the same over no portion of the Denver Company's line; but at the same time has sought to utilize the defendant's terminal facilities at Denver for the handling of its business. It has still continued, however, to send its Pueblo traffic by way of Colorado Springs, and over the line of the defendant's road.

Immediately after its Denver business began to be thus diverted, and on May 10, 1889, the general manager of the Denver Company telegraphed Mr. Cable, the president of the plaintiff company, as follows: "I have just seen Mr. Allen, general superintendent, and have notified him that although we are not required by our contract to handle or care for your trains and equipment brought to Denver over the Union Pacific line, we do so temporarily, and with the understanding that the compensation for such service, as also for the use of our tracks for such trains, will be made at an early date." To this Mr. Cable replied the next day, as follows: "Your telegram received. Of course any service performed for us, not covered by contract, will be paid for by our company. When I come out in June I will spend time enough with you to take up matters between us that may require attention. I have no doubt that everything can be satisfactorily arranged."

No payment for the use of such terminal facilities appears, however, to have been made, the plaintiff asserting its right to use these terminals, for its business brought over the Union

Pacific tracks, under the contract made with the Chicago Company. The parties being unable to agree upon a proper construction of the contract, the defendant gave notice that it would, on August 1, 1890, exclude from its Denver terminals all business brought over the Union Pacific tracks. Thereupon the Rock Island Company filed this bill, and applied for a restraining order, which was granted. By amendments and supplemental bill there were brought into the controversy other matters of difference which had arisen between the two companies. Upon the hearing in the Circuit Court a decree [1]

---

[1] " This cause coming on now to be finally heard, upon the complainant's bill of complaint and amendments thereto, and its supplemental bill of complaint, and upon the amended answer of the defendant to the complainant's bill of complaint and amendments thereto, and the answer of said defendant to the complainant's supplemental bill of complaint, and upon the issues joined thereon between the parties, and upon the evidence adduced in said cause, and the court now having heard the same and the arguments of counsel, the court doth now find, order, adjudge and decree as follows :

" 1. That under the provisions of the contract bearing date February 15, 1888, made and entered into between the Denver and Rio Grande Railroad Company, the defendant above named, and in said contract described as ' The Denver Company,' of the one part, and the Chicago, Rock Island and Colorado Railway Company, in said contract described as ' The Chicago Company,' of the other part, being the contract set forth in the complainant's bill of complaint, the complainant, The Chicago, Rock Island and Pacific Railway Company, as the successor in interest of the said The Chicago, Rock Island and Colorado Railway Company, has the right to operate its trains over the line of the defendant company, described in said contract, with all the rights and subject to all the limitations in said contract granted and reserved as to the said The Chicago, Rock Island and Colorado Railway Company.

" 2. That the said complainant is not, under said contract, entitled, nor has it any right to bring its engines, cars or trains over the tracks of the Union Pacific Railway Company, into or upon the Denver terminals of the defendant company; and that said complainant has no right under said contract, in the tracks, switches, side-tracks or terminals of the said defendant, except for such business as it brings upon said tracks by the way of the city of Colorado Springs; that the rights granted under said contract by the defendant to the said The Chicago, Rock Island and Colorado Railway Company, run with and are appurtenant solely to the line of railway connecting with the defendant's line of railway at said city of Colorado Springs; and that the complainant is, under said contract entitled to carry business to and from any portion of the defendant's said line of railway,

was made settling the rights of the two companies to this contract (45 Fed. Rep. 304), from which both parties appealed to this court.

---

described in said contract, by the way of said city of Colorado Springs and not otherwise.

"3. That the complainant under and by virtue of said contract, is entitled to and has the right, at its option, to employ its separate switching crews, and operate its own switching engines in the railroad yards of the defendant company, under the sole and absolute supervision, direction and control, however, of the yard master, or other properly constituted officer or agent of the defendant, and subject to the orders and instructions of said yard master, or other officer or agent so appointed by the said defendant, which orders and instructions shall be given and executed in good faith and without discrimination, and in accordance with the provisions of said contract.

"That the complainant is also entitled and has the right at its option, to handle traffic with its separate employés, and to perform any other service which can be performed for it exclusively, including the handling of traffic received from or delivered to other railroads by the complainant, to the same extent and as fully in all respects as the defendant may perform like services for itself, and have like use of the joint property for that purpose.

"4. That the words 'Shops at Burnham' used in section one (1) of Article (1) of said contract of February 15, 1888, include all lands used or procured for shop purposes and appurtenant to the shops located at Burnham, on the west side of defendant's main line of railway, bounded on the north by the north line of the parcel of land known as the 'Burlingame tract,' and on the south by the north line of the parcel of land known as the 'Bailey tract' (being the north line of Vasquez street), containing sixty acres, more or less, together with all buildings, tracks and other improvements or appurtenances thereon situated; and that the complainant has no interest in or right to the use of any portion of said premises hereinabove described.

"The complainant shall not be excluded from the use of the wye track at Burnham for the turning of its engines, cars and trains, so long as it shall continue to pay for the use thereof interest at the rate of two and one-half per cent (2½ %) per annum on the cost of its construction, unless and until the defendant shall provide at Denver another wye track for the turning of such engines, cars and trains.

"5. The parties shall set apart a track at Denver on which the complainant shall have the right to clean its cars, and if no existing track can be conveniently devoted to that purpose, the defendant shall construct and equip a track therefor, at the joint expense of the parties, plaintiff and defendant.

"6. It is further by the court ordered and adjudged, that each of the parties, plaintiff and defendant, shall pay the one-half of all costs taxed up or to be taxed in this cause."

*Mr. Thomas F. Withrow, Mr. Thomas S. Wright* and *Mr. A. E. Pattison* for appellant.

*Mr. Edward O. Wolcott* and *Mr. Joel F. Vaile* for appellee.

MR. JUSTICE BROWN delivered the opinion of the court.

(1) A preliminary question is made with regard to the rights of the Rock Island Company as the successor of the Chicago Company under the contract of February 15, 1888. By art. III, § 9, of this contract it was provided that it should " attach to and run with the railways of the respective parties during the corporate existence of each, and of all extensions of such existence, by renewal or otherwise, and shall be binding upon the lessees, assigns, grantees and successors of each, during the continuance of their several corporate existences; provided, however, that the Chicago Company can assign its interests in this contract only by sale, lease or consolidation of its own property." The original companies, of which the Rock Island Company claims to be the successor, appear to have been the St. Joseph and Iowa Railroad Company, a Missouri corporation, and the Chicago, Kansas and Nebraska Railway Company, a Kansas corporation. On May 15, 1886, the latter company leased its property and franchises to the former, which entered into possession under such lease, which is still in force. On June 13, 1888, after this contract was made, the Chicago, Kansas and Nebraska Company and the Chicago, Rock Island and Colorado Company were consolidated under the name of the Chicago, Kansas and Nebraska Railway Company, which consolidated corporation is admitted by the answer to have succeeded to and become vested with all the property and property rights, and all the corporate rights, powers, franchises and privileges of the said two constituent companies, including the contract between the Chicago Company and the defendant, and thereby entered into possession and enjoyment of the same.

It is unnecessary to set forth at length the numerous steps by way of assignments, leases and consolidations by which

the Rock Island Company became the assignee of the Chicago Company under this contract. It is sufficient, for the purposes of this case, that it assumed to take the place of the Chicago Company; that it entered into open possession of the property of that company, and upon the performance of this contract, on the first of January, 1889; that it was recognized by the Denver Company as taking the place of the Chicago Company; that this was done with the consent of that company, and that no question was ever made by the Denver Company of its rights under this contract until its answer was filed in this case: and in its cross-bill the Denver Company prayed for the specific performance of the contract against it. From the time of the consolidation in June, 1888, business was transacted with the defendant in the name of the Chicago, Kansas and Nebraska Company, the consolidated company; and the defendant in issuing its time-cards, at the time connection was made and trains began to run, upon the information furnished it by the officers of that road, designated its trains as the "Chicago, Kansas and Nebraska Express," etc. In May, 1889, upon the request of plaintiff's officers, the caption was changed to the "Chicago, Rock Island and Pacific." On May 16, a notice was issued stating that plaintiff had assumed the operation of the Chicago, Kansas and Nebraska Railway. Upon this coming to the hands of the law department of the defendant in July, some correspondence was had, by which the defendant was apprised that the Rock Island Company was operating the line of the other under a lease. Upon this information, the managing officers of the defendant recognized the plaintiff as the successor in interest under the contract, and made no question of its rights for more than a year thereafter. Had the Denver Company refused to recognize the plaintiff as the legal successor of the Chicago Company, and refused to acknowledge its contract with the Chicago Company as importing any obligation or liability on its part towards the plaintiff, a serious question might have arisen as to the rights of the latter, under this alleged assignment, as the successor of the Chicago Company. But, under the circumstances of this case, a court of equity will treat the as-

signee in fact as the legal assignee, possessed of the rights and charged with the obligations of the original party to the contract. *Wiggins Ferry Co.* v. *Ohio & Mississippi Railroad*, 142 U. S. 396. In short, we find no difficulty in holding that the plaintiff was entitled to file this bill.

(2) The most important question in this case relates to the proper construction of art. 1, § 1, wherein the Denver Company "lets the Chicago Company into the full, equal, joint and perpetual possession and use of all its tracks, buildings, stations, sidings and switches, on and along its line of railway, between and including Denver and South Pueblo, excluding its shops at Burnham, meaning and intending hereby to include in the description aforesaid all and every portion of its railway and appurtenant property between and at the points aforesaid, and all improvements and betterments thereof, and additions thereto, which may be jointly used by the parties, as hereinafter provided." The question is whether this general language is controlled or limited by the facts existing at the time the contract was executed, or by the subsequent provisions of the contract itself. If this be in fact a lease, without qualification, of the entire road and appurtenant property between Denver and South Pueblo, then the Rock Island Company has a right to make use of as much or as little as it pleases, and to introduce its trains upon the tracks of the Denver Company wherever it may choose to do so. It may not only make use of the terminal facilities at Denver for its traffic over the Union Pacific, but it may contract for trackage over any road running to Denver, Pueblo, or the intermediate stations, and demand the use of the defendant's terminals for its entire business over such roads.

There can be no doubt whatever of the general proposition that, in the interpretation of any particular clause of a contract, the court is not only at liberty, but required, to examine the entire contract, and may also consider the relations of the parties, their connection with the subject matter of the contract, and the circumstances under which it was signed. Prior to the execution of this contract, the Chicago Company had determined to construct a road into the State of Colorado

from its eastern boundary. Its officers had not, however, settled upon the particular route — whether they should build an independent road from the Kansas State line to Denver, with a branch to Pueblo, or build a connection with the defendant's road at Colorado Springs, thence reaching Denver and Pueblo over defendant's line. This connection had not been made at the time the contract was entered into, though there is a preliminary recital that "the Chicago Company owns a railway which is being constructed from the western boundary of the State of Kansas, at which point it will connect with the Chicago, Kansas and Nebraska Railway, to the city of Colorado Springs," indicating very clearly that this was the road within the contemplation of the parties. Indeed, there was an express provision in the body of the contract (art. III, § 10) that the Chicago Company should, on or before the first day of April, 1888, notify the Denver Company whether or not it elected to build its line to Colorado Springs, and that if it should elect to build such line it was to complete the same and to occupy the line of the Denver Company, and to be bound by the terms of the contract, on or before the thirty-first day of December, 1889. "If it shall elect not to build said line, this contract shall on the said first day of April, in the year 1888, become void and of no effect;" — in other words, the very life of the contract was made to depend upon the fact whether this connection was made, and until that time it was not to go into operation. It is quite evident from this that if, instead of completing its road to Colorado Springs, the Chicago Company had made the connection with the Union Pacific which it subsequently did make, the Denver Company would not have been under the slightest obligation to afford the terminal facilities which the plaintiff now claims. The Denver Company as well as the Chicago Company undoubtedly had an object in view in making the contract, which was largely, at least, to obtain a revenue from the use of its tracks between Denver and Pueblo, of which the terminal facilities at these points were but an incident.

Indeed, the contract from beginning to end is full of provisions which indicate that the minds of the parties met only

upon an understanding that the Chicago Company should make its connection with the Denver road at Colorado Springs, and should make a constant use of its tracks from that point to Denver and Pueblo, and, inferentially at least, that the Denver Company would not have consented to it upon any other theory. The preamble contains a recital that "the interest of both parties and of the public will be promoted by the establishment and operation of a through line of railway between all the points on the line of the railway of the Denver Company, between and including Denver and South Pueblo, and all points on the line of railway which will be operated by the Chicago Company, and on the system of railways of which the Chicago Company will form a part." By art. II, § 3, the Chicago Company covenanted that it had power to construct a line from the western boundary of Kansas to Colorado Springs. By art. I, § 3, the Denver Company is to furnish "all water and coal which the Chicago Company will need for the operation of its trains *over the railway of the Denver Company*. It agrees, if so required, to provide and maintain engine-houses to properly and safely shelter all locomotive engines which said Chicago Company may have occasion to use on *the railway of the Denver Company*." (Art. I, § 5.) The rent payable by the Chicago Company began to run "from and after the completion of its railway from the boundary line of the State of Kansas to a connection with the railway of the Denver Company at or near Colorado Springs." (Art. II, § 2.) And there was a further express provision that "no compensation will accrue or be paid to the Denver Company from or by the Chicago Company for the use and occupation of said premises, before the railway of the Chicago Company shall be completed from its initial point on the western boundary of the State of Kansas to a connection with the railway of the Denver Company within the time hereinafter specified." (Art. II, § 2, sub. 10.) Among the payments to be made was a proportionate amount of the cost or expenses for keeping the railway and appurtenant property in repair, and supplying it (the Chicago Company) with water, "as the number of wheels per mile run by it, the Chicago

Company, over said railway, or any part thereof, bears to the whole number of wheels per mile run over the same during the same period," (Art. II, § 2, sub. 4,) — a provision wholly inapplicable to the separate use of terminal facilities; since it needs no argument to show that the amount of compensation for the use of such facilities cannot be practically determined upon a wheelage basis.

By art. III, § 4, the Chicago Company agrees to do no business as a carrier of persons or property between Denver and Colorado Springs, or between intermediate stations between Colorado Springs and Pueblo, or between any such intermediate stations and Denver, Colorado Springs or Pueblo; but it was to have the right "to transport persons and property between stations on its railway and connecting lines, and all points between and including Denver and South Pueblo: Provided, however, that if the Chicago Company shall at any time acquire by purchase, construction or otherwise, a railway extending not less than fifty miles from Pueblo, it shall have the right to transport persons and property between any point on such line and Denver." There is certainly an inference from this proviso that it was not contemplated that the Chicago Company should acquire similar rights upon railways from other points than Pueblo. In addition to this, the situation and plan of the Denver station grounds show that while they possess every facility for the admission of trains from the southward, their connection with the Union Pacific to the northward is by two tracks, one of which is wholly used for the transfer of freight cars to other systems of railways, the other only making direct connection with the station of the Union Pacific — an obviously inadequate provision for a large and continuous traffic. Taking all the facts of this contract together, we regard it as quite clear that it was never intended to grant the use of terminal facilities except as appurtenant to the use of the road itself. Indeed, where a road is leased with its terminal facilities the implication is strong that it was the lease of the road which induced the lease of the terminals, and the contract should not be construed as importing a separate lease of such terminals without clear language to that effect.

If plaintiff's contention be correct, we see no reason why it may not construct or lease another track direct from Limon to Pueblo, and demand the use of the defendant's terminals at that point, and practically, at least, abandon its line to Colorado Springs.

Upon the whole, we think the defendant's construction of this contract is the correct one, and the decree of the court below in that particular should be affirmed.

(3) A question of some importance arises with regard to the proper construction of the exception, in the general granting clause, of the "shops at Burnham," the plaintiff claiming generally that the restriction applies only to the shop buildings and the land upon which they stand, and the defendant insisting that it includes all that portion of its property at Burnham west of the main line, consisting of about sixty acres purchased and mostly used for the construction, repairing and equipment of its rolling stock. The specific parcels of such property in dispute are, (*a*) about twenty acres south of the shop grounds proper, known as the Bailey tract, lying mostly to the west of the main line, which runs through the tract; (*b*) about six acres to the northward of the shops, and known as the Burlingame tract; (*c*) certain coach tracks within the yard occupied by the machine shops, and used by both parties for cleaning their passenger coaches; (*d*) a certain track known as the "wye," on the Bailey tract, and used for reversing the direction of the trains.

In ascertaining the scope of this exception little aid can be derived from the illustrations employed by counsel upon both sides, since the meaning of the reservation must be determined in every case by the particular facts of such case. For instance, if the vendor of a city lot should, in a deed of such lot, reserve to himself a building standing thereon, it would be manifest that he reserved only the right to remove such building, since a different construction would be destructive of the grant. On the other hand, if a testator devised to his sons a large farm, reserving to his widow the right to occupy the farm-house during her life, it might, and probably would, be held to include the out-buildings and gardens, or messuage.

So, while a shop in which an individual carried on a trade might be limited to the particular building, and even to the particular room in which his work was done, we should not apply this narrow construction to the shops in which a large railroad corporation carries on its manufacturing and repairing. The intent of the parties must be gathered from the character of the conveyance, the nature and situation of the property conveyed and of the property excepted, and the purpose of such exception.

The grant in this case was of the "possession and use of all its tracks, buildings, stations, sidings and switches on and along its line of railway between and including Denver and South Pueblo, . . . intending hereby to include in the description aforesaid all and every portion of its railway and appurtenant property between and at the points aforesaid," etc. No specific mention is here made of real estate, and while, as we have had recent occasion to hold, *New Orleans Pacific Railway v. Parker, ante,* 42, land is not ordinarily appurtenant to other land, much less to personal property, there can be no doubt that, under this grant, all land occupied by the stations, tracks, water tanks, etc., and all other land habitually used in the daily operation of the road, would pass as appurtenant to the railway. The very fact that the grant is so liberal in its terms is an indication that the exception also should not be narrowly construed. It is evident that an interpretation which would limit it to the buildings actually used for mechanical purposes would fail to express the intention of the parties with regard to this exception, since repairs are frequently made to cars while standing in the yards, and track room must be provided for cars while they are waiting their turn in the shops, as well as round-houses for the accommodation of locomotives. As the Denver Company owned and operated some fifteen hundred miles of railway, and had its principal shops for making and repairing its rolling stock, and for storing its cars, supplies and materials for its whole line of road, at Burnham, it is manifest that extensive buildings, grounds, tracks and other appliances would be required for such purposes. The amount originally purchased seems

to have been about forty acres; but finding this to be insufficient, from time to time other purchases were made, including the two tracts in question, and at the date of the contract the ground purchased for the use of the shops and intended to be devoted to such purposes embraced about sixty acres. There was a map of these lands published in 1884, entitled "A New Map of the Denver and Rio Grande *Railway shops at Burnham,*" which it is probable, at least, was consulted by the parties before this contract was made. While there is some conflict of testimony as to what occurred at that time, it seems somewhat improbable that, in making a contract of this magnitude, some reference should not have been made to this map, a glance at which would have apprised plaintiff of what the defendant claimed to be embraced under the designation of the *Burnham shops.* For these reasons, we think that the plaintiff's theory that the exception applies only to the shop buildings is untenable.

With regard to the Bailey and Burlingame tracts, so called, it is at least doubtful whether they would have passed without the exception, as an appurtenance to the tracks, buildings, stations, sidings and switches, and other property of the road, unless, at least, they were occupied by tracks used in the operation of the road. Indeed, they are appurtenant rather to the shops than to the railway. It is clear they ought not to be detached from the shop grounds proper, with which they are connected, for which they were purchased, and of which they form a part. If these grounds were put to a separate use, distinct from the other shop grounds — a use connected with the customary operation of the road — a different question might arise.

There was no error in the decree providing that the plaintiff should not be excluded from the "wye" track at Burnham, for the turning of its engines, cars and trains, so long as it should continue to pay, for the use thereof, interest upon the cost of its construction, according to the arrangement made at the meeting of February 13, 1890, until the defendant should provide at Denver another similar track for the same purpose.

If there be any real dispute as to which is the "main line" contemplated in the 4th paragraph of the decree of the Circuit Court, it should be settled by an application to that court.

(4) Has the plaintiff a right, under the contract, to put into the Denver terminals its own switch engines, switching crews, and other employés devoted to its exclusive service? Soon after the parties entered upon the performance of this contract, a controversy arose between them respecting the employment of switching crews in the several yards of the defendant company. The plaintiff, believing that it could perform such service with its own engines and employés more economically than it was being done by the defendant, notified the defendant that it would, without unnecessary delay, place therein its own engines, agents and employés, who would perform such labor. Defendant promptly replied that it would not permit the employment of such agents, etc., and that, if any attempt were made by plaintiff to employ them, they would be ejected by force; assigning as a reason for such action that such operation of the yards would produce confusion and be attended by danger; and that the proximity of employés engaged by another company to those in its own service would create discontent and trouble between it and its own employés. Defendant subsequently consented to the employment by the plaintiff of certain classes of laborers in its yards at South Pueblo, but has persisted in its threat to exclude any one who should be introduced into the yard at Denver. Defendant justified its action upon the ground that such exclusive employment and service were not provided for by the contract, were in violation of its terms, and could not be permitted by reason of the danger to life and property, etc.

The contract is silent upon this point. The Denver Company does, however, agree (art. I, § 1) to let the Chicago Company into the full, equal, joint and perpetual possession and use of its property, and is bound to do so wherever a joint operation of such property is practicable. There is also a provision (art. II, § 2, sub. 6) for the payment by the Chicago Company, as part of the consideration, of "an amount equal to a proportionate share of the expenses actually incurred in paying

proper salaries to the general superintendent and subordinate employés, including switchmen, telegraph operators, train dispatchers and others necessarily employed in the performance of the duties incident to the joint use and occupation of said railway, not including train men, which proportion shall be ascertained in the manner  .  .  .  above set out." This provision seems to contemplate that the plaintiff shall employ its own operatives upon its own trains, the defendant retaining the general management of the road, and the direction of such employés as are necessary to its operation, and to the regular and ordinary movements of the trains of both companies, in order to prevent confusion and accidents.

This controversy with regard to the employment of switching crews was made the subject of a correspondence between the managers of the two companies early in 1889. On February 16, Mr. Smith, the manager of the defendant company, addressed the president of the plaintiff a letter in which he stated the defendant's construction of certain provisions of the contract, upon which he had taken the advice of its counsel, who, he says, in answer to a query of his, gave it as his opinion that the C. K. & N. Co. had the right, if it desired to do so, to do work in the Colorado Springs yards with its switch engines, and to do all the necessary switching for that company with its own engines; but that this could only be done under the direction and instructions of the superintendent or other designated officers of the defendant. "The same rule," said he, "applies to this case, as stated in query one, that all movement of engines, trains and cars, must be under the sole direction of the superintendent or designated officer of the" defendant. "There can be no divided authority with regard to the movement of engines, trains and cars. In this respect the yards at Pueblo, Colorado Springs and Denver are subject to the same principle."

In reply to this letter, under date of February 22, Mr. Cable, plaintiff's president, said that they acted on the theory "that the movement of trains on your tracks must be under the direction of your operating officers; that operations in the yards must conform to reasonable yard rules, and that in all

other respects we have exclusive control of our engines and cars." On the 26th, Mr. Smith said in reply : "This company is at all times ready and willing to unite with you in making and modifying rules and regulations for the movement of engines and trains in such a way as to accord equality of right, privilege and advantage as far as practicable. But in the execution of these rules and regulations there can be no divided authority." This was the construction put upon this contract by the parties shortly after it went into operation, and we think it accords with its spirit, and is not inconsistent with its letter. It is obviously necessary to the harmonious working of the two systems that the general control and management of the yard should remain with the defendant; but it is not easy to see why that control may not be as well exercised over two switching crews belonging to two different companies as over two crews belonging to the same company. The evidence shows that the defendant has nine crews working by day and six by night. There was a good deal of conflicting testimony upon the question whether such joint operation was practicable, and a large number of witnesses were sworn on both sides. Upon the whole, we have come to the conclusion that, while at times it may not be convenient, it is by no means impossible, and the correspondence between the parties indicates that it was not considered objectionable. The gist of the testimony upon this point seems to be that if the employés of the two companies desire to work harmoniously together there is little difficulty in doing so ; but if either party chooses to be technical in the assertion of its rights, there is abundant opportunity for friction. It occurs to us that it would cause fully as much inconvenience to transfer the control of trains from the employés of one company to those of another, as such trains entered or left the terminal yard, as it would to permit the switching of such trains within the yard by the hands that brought them in or were to take them out. It appears that yards are jointly operated in this manner in such large railway centres as Kansas City, Toledo, and Chicago without serious difficulty. We think the same rule should also be applied to those employed in handling the

freight. With reference to this, the decree of the court below provided that the plaintiff had a right, at its option, to employ its separate switching crews, and operate its own switching engines in the yards of the defendant company, under the sole and absolute supervision, direction and control, however, of the yard master or other properly constituted officer or agent of the defendant, and subject to the orders and instructions of such yard master, etc., and in this there was no error.

(5) Defendant also assigns as error that portion of the decree adjudging that defendant should set apart a track at Denver on which the plaintiff should have the right to clean its cars, "and if no existing track can be conveniently devoted to that purpose, the defendant shall construct and equip a track therefor, at the joint expense of the parties, plaintiff and defendant." While the contract makes no express mention of car cleaning facilities, it is an obvious and necessary incident to the operation of railway trains; somehow and by somebody it must be done, and it is difficult to see, why, if the plaintiff is to be admitted to the joint possession and use of the entire railway and its appurtenant property, it can be excluded from such car cleaning facilities as the defendant possesses. If defendant desires to exclude plaintiff from such facilities as it possesses at the Burnham shops, it should provide them at some other convenient point. Unless a different arrangement can be made, it is proper that the actual work of cleaning cars should be done by the plaintiff with utensils provided by it; but the track facilities must be furnished by the defendant. If, however, the plaintiff is not satisfied with the facilities offered for this purpose, and desires further facilities and conveniences which do not now exist, it should proceed under art. III, § 1, of the contract, by giving notice to the defendant of its desire, and if the defendant, within thirty days after receiving such notice, neglects or refuses to construct such facilities, the plaintiff may construct the same and have the right to use and remove them during the term of the contract. The 5th paragraph of the decree should be modified to this extent.

(6) Plaintiff also assigns as error the omission of the court to provide in its decree that the defendant should discharge

any of its employés engaged in the operation of any part of the road jointly occupied and used under the contract, upon the demand of the plaintiff that such employé be removed from that portion of the line. In this particular the contract provides (art. III, § 3) that "any employé of one company engaged in the operation of any part of the railway jointly occupied and used under this contract, shall be removed from that portion of said line upon the request of the other." The allegation of the bill in that particular is, that for the purpose of facilitating the transportation of passengers from all points on one road to all points upon the other road, the plaintiff placed in the hands of station agents at the stations between Denver and Pueblo tickets to be sold to passengers who should desire such transportation, and that defendant uniformly and persistently thwarted, when it had power to do so, all attempts to secure the movement of traffic over such through line, and instructed such agents, who were paid for their services jointly by plaintiff and defendant, to refuse to sell such tickets, and to falsely state to passengers that plaintiff's trains would not stop at such stations; and that plaintiff demanded that a number of such agents, who made such statements, should be removed; but the contract in that particular was disregarded by the defendant. In its answer, the defendant admitted that plaintiff demanded that certain of its agents be removed, but alleged that such demand was made during the pendency of these proceedings, within a few days before the filing of the supplemental bill, and that such agents had not as yet been removed by reason of the manifest oversight of the plaintiff in ignoring its time tables and the instructions therein contained, and because it believed that upon a further consideration of the facts plaintiff would withdraw the request. This point was waived in the court below upon a statement of facts made as to the particular agents in the supplemental bill named, and while there seems to be a radical difference between the parties as to a proper interpretation of this clause of the contract, the question as here presented is only a moot one, and we do not feel called upon to settle it.

This disposes of all the errors assigned by counsel, and with

the modification of the 5th paragraph, above suggested, the decree of the court below will be

*Affirmed, and the costs in this court divided.*

MR. JUSTICE BREWER dissented, being of the opinion that the construction placed upon this contract by Mr. Justice Miller on the preliminary hearing in the Circuit Court was correct.