Chicago, Milwaukee & St. Paul Railway Company, Appellant, vs. Hoyt and others, Respondents.

*December 18, 1894 — February 5, 1895.*

*Corporations: Railroads: Sale of stock: Construction of contract: Stipulations as to amount of indebtedness.*

1. In a contract giving an option to purchase a controlling interest in the stock of certain railroad companies the vendors agreed that the capital stock of said companies was "subject only to a first mortgage at the rate of $17,000 per mile, issued or to be issued, upon an aggregate mileage of 362¼ miles of main line completed railway, and subject further to an equipment mortgage of $400,000, issued or to be issued . . . and that with the exception of the above indebtedness said railroad companies shall have, in case this option is exercised by [the vendee], no other indebtedness, and that the tracks, depots, real estate, and equipment, except the equipment represented by the equipment mortgage aforesaid, shall likewise be free from any debt or incumbrances except as above specified." *Held,* that the vendors in effect guarantied that the amount of the indebtedness secured by the first mortgage should not, at the time of closing the deal, exceed the rate of $17,000 per mile of the main line of completed railway; and that the vendee might recover from the vendors the amount of such indebtedness in excess of that sum, consisting of the interest to the date of the transfer on the bonds secured by said mortgage.

2. The contract further provided that the vendee should have the privilege of taking the equipment bonds, amounting to $400,000, upon prepayment to the party or parties who might have advanced money thereon, together with six per cent. interest from the date of such advances until the date of payment. *Held,* that the amount which the equipment bonds actually issued fell short of $400,000 cannot be offset against the excess of the indebtedness on the first mortgage.

APPEAL from a part of a judgment of the circuit court for Milwaukee county: D. H. JOHNSON, Circuit Judge. *Reversed.*

In 1880 the Milwaukee & Northern Railroad Company duly made, executed, and delivered a first mortgage on that part of its line of railway from Schwartzburg to Green Bay, with a branch to Neenah, Menasha, and Appleton, at the rate of $17,000 per mile, and the same was duly recorded. On February 11, 1884, it duly made and executed a second consolidated mortgage on the line extending from Schwartzburg to Green Bay, Menasha, and Appleton, and the same was also a first mortgage on all the rest of the road, extending (with a break in the Ontonagon line) to Lake Superior; and this mortgage was duly recorded; and that railroad company covenanted therein with the trustees that they would, by construction or consolidation or purchase, construct and acquire a railroad from Schwartzburg to Lake Superior and bring it under the lien of that mortgage. Said second mortgage provided that under it bonds might be issued, numbered from 1 to 2,155, respectively, to take up the mortgage of 1880, mentioned, and which bonds could only be issued for retiring the bonds issued under the mortgage executed in 1880. It also provided for an issue of 500 bonds, numbered from 2,156 to 2,655 inclusive, for acquiring right of way and depot grounds in the city of Milwaukee (not in any way involved in this litigation). It also provided for an issue of bonds numbered consecutively from 2,656 to 2,855, to be used for the construction of ore docks (not in any way involved in this litigation). It also provided for an issue of bonds to be numbered consecutively 2,856, and so on, to be issued at the rate of $17,000 per mile *of completed road,— main line and branches,—* as fast as the road should be completed and the completion thereof certified as required.

On August 8, 1890, the several defendants, as trustees,

executors, or as individuals, as parties of the first part, entered into a written agreement with Roswell Miller of Chicago, as party of the second part, wherein it was recited and agreed, in effect, that the defendants were the owners of 50,000 shares, more or less, of the capital stock of the Milwaukee & Northern Railroad Company, and 7,905 shares of the capital stock of the Ontonagon & Brule River Railroad Company, and of 2,125 shares of the capital stock of the Oconto & Southwestern Railroad Company; that the total capital stock of the Milwaukee & Northern Railroad Company was $51,552\frac{1}{2}$ shares, and that the total capital stock of the Ontonagon & Brule River Railroad Company was 7,905 shares; that the total capital stock of the Oconto & Southwestern Railroad Company was 2,125 shares,— all of the par value of $100 each; that the capital stock of the two last named railroad companies was convertible into the capital stock, share for share, of the Milwaukee & Northern Railroad Company; that the defendants were willing to give to said Miller the right to buy said shares of railroad stock owned by them as aforesaid, upon the terms and conditions therein set forth. In consideration of the terms therein contained, and of the sum of one dollar in hand paid by said Miller, the receipt of which was therein duly acknowledged, it was mutually agreed that the defendants agreed, for themselves, their executors, administrators, and assigns, to give, grant, and they did thereby give and grant, unto the said Miller or his assigns, the right to purchase all of said capital stock of the above-named railroad companies, which was then owned by them as above, provided the said Miller should, on or before September 30, 1890, by written notice addressed to *Alfred M. Hoyt,* and delivered at his office, No. 1 Broadway, in the city of New York, or addressed to *Angus Smith,* and delivered at his office, in Milwaukee, agree to accept and pay for the same according to the terms and conditions therein contained; that the de-

fendants agreed, upon the delivery of such written notice at
the places above named, or at either of them, within the
times specified, that they would at once deliver to the said
Miller, or his duly authorized agent or assigns, the total
amount of capital stock of the Milwaukee & Northern Rail-
road Company then owned by them, said amount being
about 50,000 shares, more or less, and that they would
within a reasonable time, unless previously done, lawfully
convert, or procure to be converted, the 7,905 shares of the
capital stock of the Ontonagon & Brule River Railroad
Company, and the 2,125 shares of the capital stock of the
Oconto & Southwestern Railroad Company, into an equal
number of shares of the capital stock of the Milwaukee &
Northern Railroad Company, and would deliver to said
Miller the 10,030 shares of the capital stock of the Mil-
waukee & Northern Railroad Company thus obtained. The
delivery of all of said capital stock by the defendants to said
Miller was to be made at the office of the plaintiff in the
city of New York. The following is a complete copy of the
third paragraph: "(3) The parties of the first part [the de-
fendants] further agree that the capital stock of said rail-
road companies is *subject only* to a first mortgage at the
rate of $17,000 per mile, *issued or to be issued* upon an
aggregate mileage for the three railroads named of three
hundred and sixty-two and one-fourth (362¼) miles of main
line completed railway, and subject further to an equipment
mortgage of $400,000, issued or to be issued, (and to the lia-
bilities incurred in the operation of the road, which shall
not exceed the amount, of cash receivables and operating
supplies then belonging to the company); and that, *with
the exception of the above indebtedness*, said railroad compa-
nies shall have, in case this option is exercised by the party
of the second part [Miller], *no other indebtedness;* and that
*all the tracks, depots, real estate, and equipment, except* the
equipment represented by the equipment mortgage afore-

said, *shall likewise be free from any debt or incumbrances except as above specified.*"

The said agreement further provided, in effect, that the defendants thereby guarantied that, if the said Miller elected to purchase the capital stock of the three railroad companies as therein provided, he should have the privilege of taking the aforesaid equipment bonds, amounting to $400,000, upon prepayment to the party or parties who might have advanced money thereon, together with six per cent. interest from the date of such advances until the date of payment; that the defendants further agreed that, in case said Miller should exercise the right of purchase therein contained, the said defendants should, immediately upon the delivery of the purchased stock, procure the substitution in the board of directors of the Milwaukee & Northern Railroad Company of such persons as the said Miller might designate; that he agreed that if he should elect on or before September 30, 1890, to exercise the option therein contained, and to purchase the said shares of the capital stock of the Milwaukee & Northern Railroad Company as above provided, and if the defendants should, according to the terms thereof, make good delivery of not less than 59,000 shares of the capital stock of the Milwaukee & Northern Railroad Company, then he agreed to pay for the same on or before September 30, 1890, upon the following terms, viz.:    One share of the capital stock, known as the common stock, of the Chicago, Milwaukee & St. Paul Railway Company, for each share of the capital stock of the Milwaukee & Northern Railroad Company so delivered; or the said Miller might, at his option, have the right to pay for said capital stock in cash at the rate of $70 per share, instead of in the capital stock of the plaintiff company; that if said Miller should elect not to exercise the option therein contained, and not to purchase said shares of the capital stock of the Milwaukee & Northern Railroad Company, then said agreement should expire

by limitation at 12 o'clock midnight of September 30, 1890,. and there should be no claim by either party against the other under or growing out of the provisions of said option agreement or any of them.

Said Miller subsequently, and upon the agreement being signed by all the defendants and himself, assigned the said option agreement to the plaintiff, and the plaintiff thereupon,. before the expiration of said option, notified the defendants. that it would exercise the option of exchanging the stock. At the time of the exercise of the option by the plaintiff the said Milwaukee & Northern Railroad Company had acquired the other two roads and the stock of the other two companies in said option named, and was the owner of $362\frac{1}{4}$ miles main line completed road. There was outstanding upon the same two mortgages, the first covering the division from Schwartz-burg to Green Bay, and the second covering the whole road, under which bonds had been issued at the rate of $17,000 per mile; being 6,158 bonds of $1,000 each, 5,151 of which had been issued prior to said agreement,. and 1,007 of which were issued after the execution of said agreement, making in all $6,158,000 which is $250 less than at the rate of $17,000 per mile of such completed road, the interest upon which had been paid up to June 1, 1890. On September 30, 1890,. the said *Alfred M. Hoyt* met the vice president of said plaint-iff, and thereupon said vice president paid to said *Hoyt*, for the defendants in this action, the said sum of $250 for such excess, and the said *Hoyt* thereupon delivered to said vice president of the plaintiff 61,168.71 shares of the stock of the Milwaukee & Northern Railroad Company, and received from him in exchange therefor 61,168 shares of the stock of the said plaintiff, and $49 for the $\frac{71}{100}$ of a share of stock of the Milwaukee & Northern Railroad Company in excess of the amount of stock of the plaintiff company delivered to said *Hoyt* by said vice president. On September 30, 1890, the plaintiff became the sole owner and holder of said 61,168.71

shares of the capital stock of said Milwaukee & Northern Railroad Company, and also the sole owner of all the shares of the capital stock of said Milwaukee & Northern Railroad Company.

Said amount of $6,158,000 of bonds were ordinary coupon bonds, and interest had been accruing thereon from June 1, 1890, and there had accrued thereon, up to the time of such exchange of stock, the amount of $123,160, being four months' interest, at six per cent. per annum, upon all said bonded debt, which interest matured on the 1st of December following, and was paid at maturity by the plaintiff, in behalf of the Milwaukee & Northern Railroad Company, upon the presentation of the coupons therefor from said bonds. The excess of liabilities incurred in operating the Milwaukee & Northern Railroad at the time of the exchange of stock, over and above the amount of cash assets and operating supplies, was $17,000. At the time of the exchange of stock there were outstanding six coupons from bonds secured from said mortgage, due June 1, 1890, which the holders thereof had not presented to the Milwaukee & Northern Railroad Company for payment, which have since been presented to and paid by the plaintiff in behalf of that company.

On March 3, 1892, the plaintiff commenced this action to recover said $123,160 back interest, and the amount of the six outstanding coupons mentioned, amounting to $180, making in all $123,340 unpaid interest, and said sum of $17,000 in excess of operating liabilities over and above cash assets and operating supplies. The defendants answered by way of admissions, denials, and counter-allegations. A jury was waived, and the cause was tried by the court. At the close of the trial the court found, among other things, the facts stated, and as conclusions of law the court found, in effect, that the plaintiff was entitled to recover said sum of $17,000, and directed judgment in favor of the plaintiff for that amount, but also found that the plaintiff was not en-

titled to recover the said sum of $123,340, or any part thereof; and judgment was thereupon ordered and entered accordingly. From so much and such part of said judgment as adjudges that the plaintiff is not entitled to recover said sum of $123,340, with interest, as prayed, the plaintiff appeals.

For the appellant there were briefs by *C. H. Van Alstine,* attorney, and *John W. Cary* and *Burton Hanson,* of counsel, and oral argument by *Mr. Cary* and *Mr. Hanson.*

For the respondents there was a brief by *E. Mariner,* attorney, and a separate brief by *Winkler, Flanders, Smith, Bottum & Vilas,* of counsel, and oral argument by *Mr. Mariner* and *Mr. J. G. Flanders.*

CASSODAY, J. The question presented turns upon the construction to be given to the third paragraph of the option contract, of which a complete copy is given in the foregoing statement. That paragraph embraces three separate and distinct subjects, and each should be considered by itself, except in so far as the consideration of the language applicable to the one may aid in construing the language applicable to one or both of the others.

1. As the plaintiff recovered judgment for $17,000, as the excess of operating liabilities over and above the cash assets and operating supplies at the time of making the exchange and closing the contract, September 30, 1890, under that clause of the paragraph which is inclosed in parentheses, and as there is no appeal from that part of the judgment, the clause in parentheses is thereby practically eliminated from any further consideration on this appeal.

2. By such elimination, and omitting non-essentials, the third paragraph is to the effect that the defendants thereby agreed that the capital stock of said railroad companies was "*subject only*" to a first mortgage at the rate of $17,000 per mile, "*issued or to be issued*" upon an aggregate mile-

Chicago, Milwaukee & St. Paul R. Co. vs. Hoyt and others.

age for the three railroads named of 362¼ miles of main line *completed railway,* and subject further to an equipment mortgage of $400,000, "*issued or to be issued,*" and that, with the *exception* of the above indebtedness, said railroad companies should have *no other indebtedness,* and that all the tracks, depots, real estate, and equipment, *except the equipment represented* by the equipment mortgage aforesaid, should likewise be *free from any debt or incumbrances,* except as above specified.

Counsel strenuously contended that the language employed with respect to the first mortgage for $17,000 per mile of the main line of completed railway, mentioned, was by way of description, and not by way of a limitation upon the amount of indebtedness secured by that mortgage. There would have been much force in the contention had the mortgage been for a fixed amount and such amount had been referred to merely by way of description. But, as indicated, the mortgage was to secure bonds "*issued or to be issued.*" A considerable portion of the bonds were issued in 1884, about the time the mortgage was executed. Others were issued from time to time as sections of the main line of the road had been, or were thereafter, completed. The court finds that 5,151 of those bonds, of $1,000 each, amounting to $5,151,000, were issued prior to the execution of the option agreement, and 1,007 of those bonds, of $1,000 each, amounting to $1,007,000, were issued after the execution of that agreement and before the completion of the deal. Obviously, no purchaser could, at the time of making the contract, know the number of such bonds which had then been issued. Much less could he know the number which might thereafter be issued before closing the deal. Moreover, such purchaser could not know at the time of making the contract whether any of the interest on any of such bonds had been paid, or, if any had been paid, the amount thereof, or whether any that remained unpaid would be paid prior to

closing the deal.   As to any and all such facts the purchaser
was necessarily compelled to rely upon such information and
such promises as the sellers might impart or make.

In construing contracts, courts are not only required to
look at the language employed, but the subject matter and
the surrounding circumstances, and thus avail themselves of
the same light which the parties possessed when the con-
tract was made.   *Merriam v. U. S.* 107 U. S. 441, and cases
there cited.   Where the language of a contract is suscepti-
ble of two meanings, the court will infer the intention of
the parties, and their relative rights and obligations, from
the circumstances attending the transaction.   *U. S. v. Gib-
bons*, 109 U. S. 200.   "In the interpretation of any particu-
lar clause of a contract, the court is required to examine the
entire contract, and may also consider the relations of the
parties, their connection with the subject matter of the con-
tract, and the circumstances under which it was made."
*Chicago, R. I. & P. R. Co. v. D. & R. G. R. Co.* 143 U. S.
596; *Knox Co. v. Ninth Nat. Bank*, 147 U. S. 99.

Putting ourselves in the shoes of the parties at the time
of making the contract, and remembering that the first
mortgage was not only to secure bonds which had been
issued, but such as should thereafter be issued up to the
time of closing the deal, and hence that the amount of such
indebtedness was not only then unknown to the purchaser,
but unascertainable by either party, and it is very obvious
that a purchaser of ordinary prudence would naturally
exact, and the sellers willingly make, some stipulation as to
the limit of such indebtedness at the time when the deal
should be closed.   In our judgment, the third paragraph of
the contract does contain such a stipulation.   Had the par-
ties intended that the amount of the first mortgage should
be mentioned merely by way of description, then the para-
graph should have stopped with such mention, but it did
not.   On the contrary, it declares, in effect, that the capital

stock of the three companies was "subject *only*" to a first mortgage at the rate of $17,000 per mile of the "main line of completed railway," "issued or to be issued." Then, after providing, in effect, that the three roads should be "subject further to an equipment mortgage of $400,000, issued or to be issued," and operating liabilities to an amount not exceeding the cash assets and operating supplies, it declares, in effect, "that, with the exception of the above indebtedness, said railroad companies *shall have . . . no other indebtedness,* and that *all* the tracks, depots, real estate, and equipment, except the equipment represented by the equipment mortgage aforesaid, shall likewise *be free from any debt or incumbrances, except as above specified.*" The rule is universal that general words in a contract are strengthened by exceptions, and weakened by enumeration. *Webster v. Morris,* 66 Wis. 395, and cases there cited. Here the exceptions and limitations are stated in different ways, apparently to avoid all possible mistake. We are constrained to hold that, by a fair construction of the third paragraph, the defendants, in effect, guarantied to Miller and his assigns that the amount of the indebtedness secured by the first mortgage should not, at the time of closing the deal, exceed the rate of $17,000 per mile of the main line of completed railway.

The court found, and it is conceded, that the principal sum named in the outstanding bonds at the time of closing the deal was $6,158,000, which amount was only $250 less than at the rate of $17,000 per mile of the main line of such completed railway, and that there was also at the time of closing the deal outstanding and unpaid interest on said bonds to the amount of $123,340, making the amount in excess of the sum so guarantied $123,090. It is to be observed that the construction so put upon the contract is the same as that given to it by the defendant *Alfred M. Hoyt,* who was the active person in negotiating the contract on behalf

of the defendants, and who wrote the original draft of the same, and then, three days after its date, wrote to Mr. Miller to the effect that his construction of the third paragraph would make it necessary for the defendants "to assume the interest on the bonds referred to therein, to the date of the transfer" to him under the contract; although it should be stated that several of the defendants were unaware of that letter, and never acquiesced therein.

3. It is further contended on the part of the defendants that, even if the third paragraph is to be thus construed,— that the indebtedness should not exceed the $17,000 per mile of the main line of completed road,— still the excess mentioned is more than offset by the difference in the amount of the equipment bonds actually issued and the amount authorized to be issued under the equipment mortgage, and hence that the sum total of the indebtedness of the three companies did not exceed the limitations guarantied by the defendants.   This calls for a construction of the language of the contract applicable to the equipment mortgage.   That language is to the effect that the defendants further agree that the capital stock of the three companies is "subject further to an equipment mortgage of $400,000, *issued or to be issued,* . . . and that, with the exception of the above indebtedness, said railroad companies shall have . . . no other indebtedness, and that *all* the tracks, depots, real estate, and *equipment,* except the *equipment represented by the equipment mortgage aforesaid,* shall likewise be *free from any debt or incumbrances,* except as above specified;" that said Miller or his assigns "shall have the privilege of taking the aforesaid equipment bonds, amounting to $400,000, upon prepayment to the party or parties who may have advanced money thereon, together with six per cent. interest from the date of such advances until the date of payment." By "equipment," as used, we understand reference is made to the locomotives, cars, furniture, etc., with which the three

railroads mentioned were, at the time of closing the deal, to be equipped. The equipment mortgage was to secure bonds which had been issued prior to the making of the contract, and also such as should thereafter be issued, up to the time of closing the deal. The bonds so issued prior to closing the deal would, we infer from the language employed, be equivalent in value to the locomotives, cars, furniture, etc., with which the three railroads mentioned were then equipped; hence, the expression, "all the tracks, depots, real estate, and equipment, except the *equipment represented by the equipment mortgage aforesaid,* shall likewise be *free* from any debt or incumbrances, *except as above specified.*" Besides, the contract secured to Miller and his assigns the privilege of taking up such of the equipment bonds as should be issued prior to closing the deal, by repaying to the party or parties who held the same the moneys they had respectively advanced thereon, together with six per cent. interest from the date of such advances until the date of payment. These provisions pretty clearly indicate an intention to regard the locomotives, cars, furniture, etc., constituting the equipment, as equivalent in value to the outstanding equipment bonds. True, the contract speaks of "an equipment mortgage of $400,000," but it is followed by the words, "issued *or to be issued,*" clearly indicating that only a part of the bonds had been issued when the contract was made, and that the balance might thereafter be issued. Manifestly, the excess of the indebtedness' on the first mortgage mentioned cannot be tacked to the equipment mortgage. In other words, those mortgages are treated in the agreement as separate and distinct from each other.

*By the Court.*— That part of the judgment of the circuit court appealed from is reversed, and the cause is remanded with direction to enter judgment in favor of the plaintiff and against the defendants for the additional amount of $123,090, with interest thereon from December 1, 1890.