JONATHAN L. BOOTH et al., Respondents, v. THE CLEVE-
LAND ROLLING MILL COMPANY et al., Appellants.

If, from the text of an agreement under seal, either in the body of the
instrument or in the recitals or references, there is manifested a clear
intention that one of the parties shall do certain acts, a covenant will be
inferred, for non-performance of which an action of covenant will lie.

A party cannot excuse a breach of covenant by his own wrongful act or
neglect.

In a "memorandum of agreement" made between the parties, plaintiffs
agreed to give defendants an exclusive license to manufacture, in cer-
tain States, a patented steel and iron rail, the patent for which was
owned by plaintiffs, upon certain specified "terms and conditions,"
which related to a royalty to be paid plaintiffs, a notice to be given
them of a contemplated delivery of rails, and the keeping and rend-
ering accounts of delivery; then followed certain stipulations and agree-
ments on the part of plaintiffs; and then the following on the part of
defendants, that they "are to proceed at once to make said rail so long
as the said rail holds good as a practicable and reliable rail for use," and
to use all proper efforts and due diligence to introduce and sell the
same. It was also provided as to rails to be made by the defendants
under the license and agreement, as follows: "All rails to be made of
good material and in a workmanlike manner." The license given in
pursuance of the agreement referred to it, and stated that the right was
granted so long as defendants should supply the demand for the rails,
pay the license royalty, and conform to all the obligations of the agree-
ment. In an action upon the contract, held, that the provisions quoted
were covenants, not conditions of the license, and that for a failure to
perform them an action was maintainable.

Also, held, that defendants, being joint contractors, all were bound by the
acts of each; and that a contract made by one of them for a sale of a
quantity of rails was competent evidence against all to show that there
was a market for the rails and that sales could be made of them.

Also, held, that if defendants made and sold rails which, because of the
use of improper materials, or defects in construction, were returned for
restoration and repairs, and so they were disabled from performing a con-
tract for new rails, they could not set up the disability as an excuse for
non-performance.

A witness for defendants having testified to the effect of the weather and of the wear upon rails of plaintiffs' patent, which he saw in use, the length of time they were kept in use, and that compared with them the iron rail was better, was asked to give his opinion as to the comparative durability of the two kinds of rail; this was excluded. *Held*, no error, as his opinion would have added nothing to the effect of his evidence from knowledge.

Also, *held*, that evidence on the part of plaintiffs, as to the quality of steel used by defendants, and a comparison thereof with that used in the manufacture of other steel rails, evidence of the refusal of defendants' officers to subject their steel to examination by an expert, and evidence of the wear of plaintiffs' rail, as compared with solid steel rails, subjected to the same test, was competent.

Also, that evidence as to statements of defendants' vice-president, in respect to business between the parties then in progress under his direction, was competent and binding upon them.

(Argued April 25, 1878; decided May 21, 1878.)

APPEAL from judgment of the General Term of the Supreme Court in the fourth judicial department, in favor of plaintiffs, entered upon an order denying a motion for a new trial and directing judgment on a verdict. (Mem. of decision below, 11 Hun, 279.)

This action was brought to recover damages for an alleged breach of covenants in a contract between the parties.

The contract, which was under seal, was as follows: "Memorandum of agreement made this 1st day of June, 1869, between J. L. Booth, of Rochester, N. Y., Joseph B. Sprague, and Mrs. L. S. Ashley, of New York city, party of the first part, and The Cleveland Rolling Mill Company, The Union Rolling Mill Company, of Chicago, Ill., and The Western Iron Company, of Harmony, Indiana, parties of the second part, witnesseth: The party of the first part hereby agree to give to the party of the second part a full license to manufacture "Booth's" patent duplex safety steel and iron rail in the States of Ohio, Indiana and Illinois, said license to continue through the life of all patents now existing, and of all improvements upon such patents which may be hereafter issued to J. L. Booth, and to all patents now held, or which may hereafter be obtained, on any machinery

for the manufacture of said rail, such license to be exclusive in said States, except as hereinafter stated, so long as the said company shall supply the demand for the rail in said States; all rails to be made of good material, and in a workmanlike manner, and according to the directions of the licensors, except in such particulars as may be discovered to reduce the cost or improve the quality of the manufacture without detriment to the value of the rail. The licensors reserve the right to inspect all rails made before the same are delivered to any purchaser; the right to sell the patent right to any railroad company having the whole or any portion of their road in the said States, or either of them. The railroad company so purchasing, to be restricted to manufacture only at their own works, on their own line, and for their own road. The said license to manufacture in said three States to be issued to the said party of the second part upon the following terms and conditions, viz.: That the patent royalty to be paid to the party of the first part shall be two dollars and fifty cents ($2.50) per gross ton for the first seven thousand (7,000) tons manufactured, and such amount is to continue assessable upon all rails manufactured under such license, and to be paid to the licensors, except that after the manufacture of said seven thousand (7,000) tons the said licensors have the right to increase or diminish the amount. Any increase not to exceed two dollars and fifty cents ($2.50) per ton royalties, to be paid on the fifteenth (15th) of each month, for all rails sold and delivered the previous month. The said licensees to give the licensors notice of any contemplated delivery of any quantity of rails, so that the licensors may have the same inspected, if they desire all defective rails, if any such are delivered, to be sold as such, and not as first quality, and the purchaser must be fully informed of their inferior quality. The royalty to be paid on such defective rails, or second quality of rails, shall be one-half of the royalty paid on perfect rails. True and correct accounts are to be kept of all deliveries of said rails by the licensees, and said accounts are to be open at all times to the inspection of the licensors

or their agents. In order to forward the making of said rail in Cleveland, the said J. L. Booth will furnish all such machinery, tools or other accessories, that are now in his possession, or in possession of any of the parties of the first part, now in their mill at Rochester, as the said second part may require. The same to be shipped by the said party of the first part to the order of the said party of the second part. The value of the machinery, tools and accessories so shipped to be agreed upon by the parties of the first and second parts ; and in case they are unable to agree, the value is to be fixed by disinterested referees, to be elected one by each party ; and in case the two cannot agree, they are to choose a third referee, and the valuation which they agree upon shall be binding upon the parties. The ownership of the property to be retained by the said party of the first part until the completion by them, the said party of the second part, of the first seven thousand (7,000) tons of rails, then it is to be taken by the said party of the second part, and paid for at the valuation agreed or fixed upon, with interest after the expiration of the first three months from the shipment. The said J. L. Booth, the patentee, to render all assistance and aid in his power in the construction of any new machinery, arranging the same, shipping the machinery from his works in Rochester, as well as in putting the same in working order in Cleveland and starting the manufacture of said rail, but is to have his expenses and all necessary disbursements paid by the party of the second part. The said second party are to proceed at once to make said rail in Cleveland, and within a reasonable time in Chicago, and to use all proper efforts and due diligence to introduce and sell the same ; no other rail made by them to receive more attention or interest than the Booth rail, so long as the said rail holds good as a practical and reliable rail for use ; no other manufacturers in the United States are to have the right to manufacture the said Booth rail at any less royalty than is paid by the said party of the second part. It is further agreed and understood by the parties hereto, that

where the royalty is reduced for reason of defect, it is also in supposition and fact that they are sold at a less price, and the parties purchasing such defective rails be prohibited by contract from laying them upon any main line track of any road ; and such purchasers of defective rails, or second-class rails, must give to the party of the second part to this agreement a written obligation, agreeing to be held responsible, and to be treated as using the said rails without the right to do so, and to be considered infringers of the patents and liable for all damages which it may be proven to be to any and all of the parties interested in any of the said patents, and that the fact of purchase of second-class rails of Booth's patent does not permit their use on any main line tracks, but only on side tracks, and all places where there is no fast running of trains."

On the same day plaintiffs executed to defendants a license "to manufacture the said article in the States of Ohio, Indiana and Illinois, so long as they shall supply the demand for said improvements in railroad rails in the above-named three States, paying the royalty named, and otherwise conforming to all the obligations named and made mention of in said agreement dated June 1, 1869."

The alleged breaches were that the rails manufactured by defendants under the license were not made of good material, or in a workmanlike manner ; that they had not made proper efforts or used due diligence in selling the rail, and that they neglected and refused to fill orders, particularly a contract between defendant the Cleveland Rolling Mill Company, and the Lake Shore and Michigan Southern Railway Company for 4,000 tons of the rails.  Defendants claimed and gave evidence tending to show that plaintiffs' rail was not "a practicable and reliable rail for use," but was defective in principle, and that the failure to fill the contracts with the railroad company was because the Cleveland mill was fully occupied in repairing Booth rails before that sold to the same company, and which had given out and were returned for repair, in consequence of which said company withdrew from the contract.

Plaintiffs' evidence was to the effect that the failure of the rails manufactured by defendants was because of the unskillful and unworkmanlike construction, and of the use of inferior steel.

The jury rendered a verdict for the amount of royalty upon the rails so contracted to be sold to the Lake Shore Company, with interest. Exceptions were ordered to be heard at first instance at General Term.

Further facts appear in the opinion.

*Geo. F. Danforth*, for appellants. The court erred in refusing to nonsuit plaintiffs. (*D., L. and W. R. R. Co.* v. *Bowen*, 58 N. Y., 580, 581.) There was no covenant on the part of defendants, but a mere naked condition on which the license or grant was made to them, avoiding it on non-performance. (*Turk* v. *Ridge*, 41 N. Y., 201; *Palmer* v. *Ft. Plain R. R.*, 11 id., 376; *Wimble* v. *Steward*, 22 Barb., 160; *Ashden* v. *Austin*, 5 A. & E. [N. S.], 671; *Dunn* v. *Sayles*, 5 Q. B., 685; *Hud. Canal Co.* v. *Penn. Coal Co.*, 8 Wal., 276; *Rhodes* v. *Forward*, L. R., 1 App. Cas., 256; *Churchward* v. *Queen*, L. R., 1 Q. B., 172; *Culver* v. *Sisson*, 3 N. Y., 264; *E. and S. Mar. Ins. Co. Ex parte Maclure*, L. R., 5 Ch. App. Cas., 737; *Newell* v. *Wheeler*, 4 Robt., 190, 247, 255; 36 N. Y., 244.) Evidence of the quality of the steel in the Booth rail, as compared with the steel of other makers, was improperly received. (*Gouge* v. *Roberts*, 53 N. Y., 619; *Siegel* v. *Lewis*, 54 id., 651; *Carlton* v. *Hiscock*, 107 Mass., 410; *Diefendorf* v. *Gage*, 7 Barb., 20; *Harris* v. *Panama R. R. Co.*, 5 Bos., 312.) It was error to receive in evidence declarations of defendants' vice-president in regard to the rails. (A. & A. on Corps., § 309; *Fogg* v. *Child*, 13 Barbour, 246; 114 English C. L., 748; *Luby* v. *H. R. R. R. Co.*, 17 N. Y., 133; *Card* v. *Harlem R. R. Co.*, 50 Barb., 39; *1st. Bap. Ch.* v. *Bklyn. F. Ins. Co.*, 23 How. Pr., 448; *Sup't. Poor Cort. Co.* v. *Sup't. Poor*, 28 N. Y., 153; 44 id., 22; *Lund* v. *Inhab'ts*, 9 Cush., 45.)

*W. F. Cogswell*, for respondents.   The evidence of defendants' analytical chemist that defendants refused to furnish plaintiffs with specimens of steel used by defendants in the manufacture of rails for analysis was competent.   (*Amory* v. *Delamorie*, 1 Stra., 505; *Clunner* v. *Pizzy*, 1 Camp., 8.) The declarations of defendants' vice-president were properly received in evidence.   (*Quinn* v. *Lloyd*, 41 N. Y., 349; *Hoag* v. *LaMont*, 60 id., 96, 101.)

ALLEN, J.   There is no particular formula of words, or technical phraseology, necessary to the creation of an express obligation to do, or forbear to do, a particular thing or perform a specified act.   If, from the text of an agreement, and the language of the parties either in the body of the instrument or in the recital or references, there is manifested a clear intention that the parties shall do certain acts, courts will infer a covenant in the case of a sealed instrument, or a promise if the instrument is unsealed, for non-performance of which an action of covenant or assumpsit will lie.   It is a cardinal principle that every agreement or covenant must be interpreted according to its peculiar terms, and so as to carry out the intent of the parties, and it follows that the ruling upon, and the interpretation of, one agreement will seldom aid in the construction of another, except as it may illustrate some general rule of interpretation applicable to both.

We have carefully studied the cases cited and relied upon by the counsel for the appellants, but as we understand them they do not rule or affect the interpretation of the agreement before us.   They were cases distinguishable from this, in which there was clearly no express covenant to perform the particular act claimed, and in which a covenant could not within any recognized rule for the construction of written agreements be implied.   In some the parties had expressly consented to do certain things, and the court held that for breach of these covenants an action would lie, but that additional covenants could not be implied for performance

of the express covenants. In others of the cases there was a provision for terminating the obligation, either upon the happening of some event, or at the option of the parties, and in others the doing of the act claimed was merely a condition, and not a covenant. (*Aspdin* v. *Austin*, 5 Q. B., 671; *Dunn* v. *Sayles*, id., 685; *Beswick* v. *Swindells*, 3 A. & E., 868; *D., L. and W. R. R. Co.* v. *Downs*, 58 N. Y., 581; *Rhodes* v. *Forwood*, L. R., 1 Appeal Cases, 256; *Churchward* v. *Queen*, L. R., 1 Q. B., 172; *Ex parte Maclure*, L. R., 5 Ch. App., 737; *Newell* v. *Wheeler*, 36 N. Y., 244.) In *Culver* v. *Sisson* (3 Comst., 264), there was neither an express promise, nor an acknowledged indebtedness or obligation upon which an action would lie. In *Palmer* v. *F. P. and C. P. R. Co.* (1 Kern., 376), it was merely held that a naked condition in a grant did not create a personal obligation in the grantee to perform the condition. *Turk* v. *Ridge* (41 N. Y., 201) was upon a penal bond conditioned for the payment of certain obligations, and was decided by a divided court, a majority of the court not assenting to the reasons assigned in the opinion published as the prevailing opinion. It was well decided upon other grounds than those stated in the opinion, and the case does not bear upon this, whether the decision rests upon the reasoning of Judge Mason, or the ground stated by Judge Lott as another reason which might have been assigned for the judgment. If the claim of the counsel for the defendants is well founded, and upon a just interpretation of the agreement before us there is no express promise by the defendants to perform the stipulations of the contract, but the terms imposed upon the defendants, and the duties required from them are simply and only conditions upon the performance of which their rights under the license depend, he is right in his contention that there is no cause of action against the defendants, as no promise can, in the absence of an express promise, or evidence of an intent to promise, be implied for the performance of the acts for the non-performance of which this action is brought. When a contract is drawn

with technical accuracy, and with obvious attention to details, and there is absence of language tending to a conclusion that the covenant or promise sought to be set up was intended, such covenant or. promise will not be implied. (*Hudson Canal Co.* v. *Penn. Coal Co.*, 8 Wall., 276.) The agreement which is the foundation of this action was drawn without as much regard to form as to substance, and the parties were content to give expression to their general intent, without studying accuracy or fitness of expression in detail, or setting forth the positive obligations with technical precision. The agreement as reduced to writing is not unilateral, but mutual in its character and obligations, and hence was prepared in duplicate, and signed by both contracting parties, each retaining the part bearing the signature of the other. It was in terms declared to be a memorandum of the agreement between the plaintiffs of the one part, and the defendants of the other, and each became parties to it, and bound by its terms by their signatures.

The memorandum of the agreement is slightly informal in this, that by it the parties have not in technical language assumed the obligations and promised in *totidem verbis* to perform the stipulations of the agreement as recited and set forth in the paper writing, but the parties have in stating their respective obligations, and the stipulations to be performed by each, employed language fully the equivalent of an express promise, and quite as expressive of an absolute and personal obligation to perform the stipulations,. and clearly manifesting not only an intent to promise, but an actual promise. The minds of the parties having met, each having assented to the terms of the conditional arrangement, they have made a "memorandum" of the agreement in which without regard to form, the rights, duties and obligations of each are stated in substance, but in concise and popular language. In stating the duties and obligations assumed, and the acts to be performed by them respectively, it is stated as it would be stated in colloquial language and in the present tense, that the parties "are to" do or abstain from doing

some other thing which, as the words are used, is the substitute for and equivalent of an express declaration and promise that the parties will perform the stipulations named. It is a written acknowledgment that the parties have by their agreement, of which the paper writing is but the evidence, promised to perform the several acts named. The parties are only to do what they have agreed to do, and they are only to do it because they have undertaken and promised to do it, and when they say that in the memorandum of the agreement they are to do an act, it can mean nothing less than that they have promised, and do promise, as stated. Unless it be so there is no agreement, but a mere option. The defendants therefore in becoming parties to the written agreement, in which it is stated that they " are to proceed at once to make said rail, and to use all proper efforts and due diligence to introduce and sell the same," and in which it is also explicitly stated that under the license and agreement, "all rails to be made of good material and in a workmanlike manner," have expressly promised in language that cannot be misunderstood to perform their stipulations—that is, to do that which they have said that by the agreement they were to do. It is much more than the manifestation of an intent to promise, to be spelled out or inferred from language less plain and direct. The duties and obligations of both parties are set forth in the same terms, and both must have effect given to them according to the meaning of the language as used for the occasion.

The clauses in which the obligations assumed by the defendants are stated cannot be interpreted as conditions of the license. The license was given in part performance of the agreement, and in pursuance of it, and by reference contains all the conditions to which, by the terms of the agreement, it was subject, and they are stated as conditions. The contract declares that the license is to be issued " upon the following terms and conditions," and those conditions following relate to the royalty to be paid the plaintiffs, the notice to be given to them of the contemplated delivery of rails, and

the keeping and rendering accounts of the delivery of rails by the defendants. Following these conditions, upon which the license was granted, are the independent stipulations and agreements of the parties, commencing with those on the part of the plaintiffs, but these stipulations are not conditions merely, but express undertakings by the respective parties. The stipulations on the part of the plaintiffs could not have been intended as conditions merely. To give the contract the interpretation claimed for it would be to destroy it as an agreement by relieving both parties from all obligation to perform any of the stipulations. The acts contemplated by the terms of the agreement to be performed by the respective parties were necessary to the carrying out of the object in view, and to protect the rights of each. It was indispensable to the plaintiffs that the defendants, having the exclusive right to manufacture rails under the patent, should use all diligence in their manufacture and sale, to the end that the plaintiffs should reap the fruits of their invention, and that the rails should be skillfully manufactured, and from suitable materials, in order that this particular rail should not be brought into dispute and the value of the patent destroyed. The intent of the defendants to undertake expressly to perform the stipulations counted upon by the plaintiffs is clearly manifested by the terms of the agreement, and it was properly so ruled upon the trial.

Most of the exceptions of the defendants to the charge to the jury are based upon the erroneous assumption that they were, by the terms of the contract, under no express, or even implied, obligation, either to use efforts to introduce or sell the rails, and thus entitle the plaintiffs to the agreed for royalties, or to employ good material and workmanship in the manufacture of the rails; and the assumption failing, the exceptions necessarily fall with it. If there was, as we think there was, an express promise on the part of the defendants to perform the stipulations of the contract in the respect mentioned, and a breach of the agreement from which damages ensued to the plaintiffs, it follows that an action will lie for

the breach of the agreement, and it would be for the jury to assess the damages. The undertaking of the defendants was to make the rails, and use all proper efforts to sell the same "so long as the rail holds good as a practical and reliable rail for use." The question whether the rail as invented and patented by Booth, when properly manufactured and of suitable materials, was "a practical and reliable rail for use," was upon conflicting evidence submitted to and passed upon by the jury, and they have found that any failure in the rails manufactured by the defendants was the result of unskillful workmanship or defective materials. Had the jury found otherwise the defendants would, under the law and the instructions of the court, have been entitled to a verdict.

The defendants were joint contractors and all were bound for the acts of each. Hence the contract with the Lake Shore Railroad Company, although made with one of the defendants, was competent evidence against all, as it was evidence that there was a market for the rails, and that sales could be made of them. It is not necessary to hold that it was conclusive evidence. It was subject to explanation, and its effect might have been obviated by proof that it was broken by the railroad company without fault on the part of the defendants, or that the defendants were in no respect responsible for the non-delivery and acceptance of the rails under it. Proof that the rail itself was a failure would have been competent evidence to overcome the presumption coming from the making of the contract, and in this view the whole evidence as to the character and qualities of the plaintiffs' rail was submitted to the jury with the evidence touching the quality of the steel used by the defendants in their manufacture of it. If the defendants by the use of improper materials had made and sold rails which were by reason of the defects in their construction returned for restoration and repairs, so that they were disabled from performing their contract with the Lake Shore Company, they were responsible for such disability caused by their own acts. A party cannot excuse a breach of covenant or of contract by a disa-

bility caused by his own wrongful act or neglect. The charge of the learned judge upon this branch of the case was therefore proper. The comment of the judge upon the evidence, and the inferences which the jury might draw from it are not the subject of an exception. They appear to have been just and discriminating and proper to guide the jury to right conclusions, without leading them or controlling the verdict. The learned counsel is in error in the supposition that the judge instructed the jury that a single rail might be regarded as a sufficient test of the principle upon which the rail was constructed.

· The witness Billings having stated the effect of the hard winter and of the wear upon the Booth rails which he saw in use, and the length of time they were kept in use before they were removed because unfit for longer wear, and that compared with the condition of the Booth rail the iron rail was better; the defendants had all the benefit of the knowledge of the witness; and his opinion as to the comparative durability of the Booth and an ordinary iron rail, would have added nothing to the effect of his evidence, and the exclusion of the answer to the question was not error.

All the evidence as to the quality of the steel used by the defendants in the manufacture of the Booth rail was competent, as tending to show the cause of the failure of the rails, and that the failure was not the result of an inherent difficulty in the principle of its construction. The comparison of the steel used by the defendants with that used in the manufacture of other steel rails was competent, as showing that the quality of steel used by the defendants was not esteemed by manufacturers of steel rails as suitable for that purpose, and that defendants were not justified in its use because of the use of it by others for a similar purpose. It was competent to show that a different quality of steel was used and had been by actual test proved to be suitable for making a durable and permanent rail.

The evidence of the refusal of the officers of the defendants to subject their steel to an examination by an expert, as

well as evidence of the wear of the Booth rail, as compared with solid steel rail at the same point, and subjected to the same test, was competent. The first was some evidence of a willingness by the defendants, and for a reason, to suppress evidence ; and the last tended to show that the Booth rail was "practicable and reliable for use."

The evidence of Booth as to the interview with Christopher, the vice-president of the defendants, was admissible. The interview related to the current business then in progress, in which both the interlocutors were interested, and which was under the control and management of Christopher in behalf of the defendants. The statements of Christopher did not relate to a bygone transaction, but were made in the course of his official action, and in respect to the business then in progress under his direction. It was a part of the *res gestæ*, the current transactions between the plaintiffs and defendants, in respect of which the plaintiffs had a right to inquire of the officer of the defendants, by whose statements the defendants would be bound.

The only serious question in the case is as to the construction of the agreement, and that being interpreted adversely to the defendants the exceptions to the rulings of the judge at the trial, upon the questions of evidence, are of but little importance, and we discover no error in them.

The judment must be affirmed.

All concur, save ANDREWS, J., absent.

Judgment affirmed.