ALASKA TREADWELL GOLD MINING CO. et al. v. ALASKA GAS-
TINEAU MINING CO. †

(Circuit Court of Appeals, Ninth Circuit. May 18, 1914.)

No. 2311.

1. CONTRACTS (§ 169*) — CONSTRUCTION OF WRITTEN CONTRACT — EXTRINSIC CIRCUMSTANCES.

In construing the written contract of parties, it is proper for the court to consider the character of the property embraced by it and the situation of the parties at the time of making it, but that is permissible solely for the purpose of aiding in the true construction of the written instrument and not for the purpose of adding to or taking from any of its provisions.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 752; Dec. Dig. § 169.*]

2. ELECTRICITY (§ 11*)—CONTRACT TO FURNISH ELECTRIC CURRENT—CONSTRUCTION.

A written contract by the owner of an electric power plant to furnish at its power house "a current of not to exceed 300 electric horse power" for a consideration received cannot be construed to require the furnishing of three or more times such current when necessary to start a certain type of motor, although such motors were in use by the other party when the contract was made, and it was known that the current was to be used for their operation, but the necessity of a large additional current for starting purposes was not anticipated or thought of by either party.

[Ed. Note.—For other cases, see Electricity, Dec. Dig. § 11.*]

Gilbert, Circuit Judge, dissenting.

Appeal from the District Court of the United States for Division No. 1 of the District of Alaska; Peter D. Overfield, Judge.

Suit in equity by the Alaska Gastineau Mining Company against the Alaska Treadwell Gold Mining Company, the Alaska United Gold

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Rehearing denied October 13, 1914.

Mining Company, the Alaska Mexican Gold Mining Company, and Robert A. Kinzie. Decree for plaintiff, and defendants appeal. Reversed.

Hellenthal & Hellenthal, of Juneau, Alaska, and Curtis H. Lindley, of San Francisco, Cal., for appellants.

Shackleford & Bayless and Z. R. Cheney, all of Juneau, Alaska, and Albert Fink, of San Francisco, Cal., for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. The appellee was complainant in the court below, and by its bill sought the specific performance of a written contract entered into between its predecessor in interest, Oxford Mining Company, and the appellants here, who, together with their superintendent, Robert A. Kinzie, were made defendants to the bill. The contract and the decree appealed from are in words and figures as follows:

"This indenture and agreement made and entered into this 14th day of October, 1909, by and between Oxford Mining Company hereinafter called the lessor and the Alaska Treadwell Gold Mining Company, the Alaska Mexican Gold Mining Company and the Alaska United Gold Mining Company hereinafter called the lessees.

"Witnesseth, first, the lessor has this date and does by these presents lease unto the lessees all of the following described real property situated on and near Sheep creek in the Harris mining district, district of Alaska, to wit:

"The Mexico Millsite U. S. Mineral Entry No. 25, lot 71B. The Belvedere Millsite U. S. Mineral Entry No. 25, lot 72B. The Jumbo Millsite U. S. Mineral Entry No. 60, Lot No. 260. Also that certain piece or parcel of land beginning at a stake identical with Post No. 2 Jumbo Millsite U. S. Survey No. 260 on the meander line of Gastineau Channel; thence first course along the meander line of Gastineau Channel at ordinary high-water mark N. 52° 00′ W. 54 feet to stake No. 2; thence second course N. 48° 15′ E. 200 feet to stake No. 3; then S. 52° 00′ E. 54 feet to the N. W. side line of Jumbo Millsite U. S. Survey No. 260, 200 feet to stake No. 1, the place of beginning containing an area of one quarter of an acre more or less, courses expressed from the true meridian, Mag. Var. 29° 30′; and also that certain water right known as the Sheep creek water right and located on Sheep creek about three-quarters of a mile from its mouth, together with the flume and pipe line connecting the same with the beach near the mill at the mouth of the said Sheep creek, also the sawmill, boarding house, lumber sheds, wharf landing, milldam, flumes, penstocks, water wheels, and all other machinery and appliances used in connection with said sawmill, situated near the mouth of said Sheep creek, together with all machinery, tools, equipment, plants of every kind and description now upon said property for a term of ten (10) years from the date hereof at a monthly rental of one hundred and twenty-five ($125.00) dollars per month; payable in gold coin of the United States on the first day of each month during the term of said lease at the office of the lessees at Treadwell, Alaska; and it is hereby agreed, that if any rent shall be due and unpaid, or if default shall be made in any of the covenants herein contained, that it shall be lawful for the lessor to re-enter said premises and remove all persons therefrom, and the lessees do hereby covenant, promise and agree to pay the lessor the said rent in the manner hereinbefore specified, and not to let or underlet the whole or any part of said premises without a written consent of the lessor, nor to assign this lease or any part thereof without said written consent, and at the expiration of said term the party of the second part will quit and surrender said premises in as good state and condition as the same now are.

"It is the intention of the lessees to erect, equip and maintain upon said premises a water power plant of substantial size and efficiency for the gen-

eration of electric power, and if at any time after two (2) years from the date hereof the lessor or its assigns shall elect to take a current of not to exceed three hundred (300) electric horse power which shall be taken from and at the generating plant to be installed upon the leased premises hereinbefore described, the lessees undertake, covenant and agree to deliver said current to the lessor or its assigns upon the execution and delivery by the lessor or its assigns to the lessee of a deed or deeds conveying said leased property herein described to the parties of the second part. If prior to the expiration of nine years from the date hereof the lessor does not elect to convey to lessees or their assigns the property herein leased and accept in full consideration therefor the right to use the three-hundred (300) electric horse power hereinbefore mentioned, the lessees may at their option prior to the expiration of the ten (10) years provided in this lease purchase the property herein leased absolutely from the lessor by paying to the lessor the sum of twenty-five thousand dollars ($25,000) in gold coin of the United States; and the lessor covenants and agrees upon tender of said sum of twenty-five thousand dollars ($25,000) to execute and deliver such deeds of conveyance to the property herein leased as hereinbefore specified, excepting only as to the title to (1) the one-quarter acre tract hereinbefore described and (2) the premises occupied and used by the existing wharf of the lessor to both of which the lessor now asserts only possessory titles. The lessees may at their own cost and expense undertake to perfect the said titles and should lessee wish so to do the lessor shall lend all proper assistance in its power including the using of its name, and should the said titles be so perfected to the said premises or either of them, they shall become the property of the lessor and remain covered by this lease and subject to all the terms and conditions thereof.

"The covenants herein contained shall be construed as running with the land and as a charge thereon, so that any successor or successors in interest to the lessor or lessees who may acquire any interest in and to the titles to the said land shall be bound by this conveyance in the same manner as if they had executed this agreement; and the lessees hereof may require at their option that the property herein described be conveyed by the lessor to a responsible trustee for the purpose of carrying out the terms of this agreement, or that deeds and conveyances covering the property herein leased be placed in escrow so as to insure delivery of the same if required under the provisions of any of the covenants of this lease.

"If neither of the options herein provided for are accepted by either the lessor or the lessees then the property and rights herein described with all the improvements that are or that may be hereafter placed on the said premises shall be and become the property of the lessor.

"The provisions herein as to the delivery of three hundred (300) horse power at the generating plant to be installed on the premises herein described contemplates the delivery of an uninterrupted current, but the lessees shall not be liable for damages that may arise from operating and physical causes beyond its control.

"In witness whereof, the parties hereto have hereunto set their hands and seals the day and year first above written.

"Oxford Mining Company,
"Wallace Hackett, President,
"And Henry Endicott, Treasurer.
"Alaska Treadwell Gold Mining Company,
"By H. H. Taylor, President,
"F. A. Hammersmith, Secretary.
"Alaska Mexican Gold Mining Co.,
"By H. H. Taylor, President,
"F. A. Hammersmith, Secretary.
"Alaska United Gold Mining Co.,
"By H. H. Taylor, President,
"F. A. Hammersmith, Secretary."

"Witness:
"Harold Lawrence.
"Walter W. Black.

"Decree.

"This matter having come on heretofore for hearing, and the testimony of the plaintiff and the defendants having been submitted herein taken under advisement, and the court having made and entered its findings of fact and conclusions of law herein, the parties having at all times appeared by their respective attorneys, Messrs. Shackleford & Bayless and Z. R. Cheney for the plaintiff, and Messrs. Hellenthal & Hellenthal for the defendants, and the court being fully advised in the premises, it is ordered, adjudged, and decreed:

"(1) That the plaintiff is entitled to have and receive of and from the defendants, under and by virtue of the contract set forth in the plaintiff's complaint, the uninterrupted and beneficial use of 300 real or actual horse power to be supplied by electric current.

"(2) That the plaintiff is entitled to have and receive of the defendants all reasonable starting surges used in connection with the ordinary machinery used in mining for the application of 300 horse power or less and necessary to the starting of such machinery and to the beneficial use of an uninterrupted current of 300 horse power.

"(3) That the plaintiff is entitled to the use of real and not apparent power, the same to be measured by wattmeter, and that the plaintiff is entitled to use upon the circuit connecting it with the power house of the defendants any ordinary motors used in mining operations (whether of the induction type or otherwise) commonly and ordinarily used in mining operations consuming 300 horse power or less.

"It is ordered, adjudged, and decreed that the defendants herein so set and maintain their connections, circuit breakers, and other appliances with the plaintiff company that the actual, uninterrupted, and beneficial use of the before-mentioned rights of the plaintiff shall not in any way be interfered with, and the defendants are enjoined from using any appliances which will deprive the plaintiff of the enjoyment of the rights above decreed to the plaintiff; and defendants are perpetually enjoined from maintaining any circuit breaker or other appliance which will deprive the plaintiff of 300 actual horse power, or any part thereof, to be measured by wattmeters or which will deprive plaintiff of any reasonable starting surges to the enjoyment of the uninterrupted use of the said 300 actual horse power.

"The court further decrees that the plaintiff be allowed to install upon the switchboard connecting the plaintiff's power line with the defendants' power house a wattmeter, voltameter, and ammeter, and that the same be installed in such a way that the plaintiff may have the same under lock and key for its information and inspection to check the wattmeter, voltameter, and ammeter readings of the defendant companies at said point.

"It is further ordered, adjudged, and decreed in accordance with the foregoing that the contract of October 14, 1909, be specifically performed by the defendants.

"It is further ordered, adjudged, and decreed that the defendants and each of them are hereby enjoined from doing any act or thing which will interfere with the enjoyment of the rights herein decreed to the plaintiff and against the defendants.

"It is further ordered, adjudged, and decreed that the defendants maintain and install upon the connection of the plaintiff's power line with the power house of the defendants at the switchboard at the power house at Sheep creek an inverse thirty-second time relay circuit breaker in such a manner as to provide reasonable starting surges in connection with the operation of the machinery of the plaintiff company upon said power line, which said circuit breaker shall be set at all times so as to give an uninterrupted current of 300 real horse power as distinguished from apparent power, to be set and maintained in addition to the thirty-second resistance in the said circuit breaker which is decreed for the purpose of providing to the plaintiff reasonable and adequate means of obtaining starting surges without interruption in their operations, and that the plaintiff have and recover of and from the defendants its costs and disbursements herein laid out and expended.

"Done in open court this 12th day of June, 1913.

"Peter D. Overfield, Judge."

Passing the question as to whether a court of equity should undertake the enforcement of the requirements of the above decree, we inquire whether its provisions are justified by the contract of the parties. A corporation styled the International Trust Company was the predecessor in interest of the Oxford Mining Company, of which International Company Mr. L. P. Shackleford was the attorney and representative at Juneau, Alaska, in 1909, and for several years theretofore. At the same time Mr. F. W. Bradley was the consulting engineer of the appellant companies, and Mr. H. H. Taylor was their president. The evidence shows without conflict that for several years the property mentioned in the contract in question had remained idle, the water right therein referred to being as a matter of course liable to be appropriated by any third party for beneficial purposes, since the water pertained to land of the government; that under such circumstances Bradley and Taylor made a proposition to Mr. Shackleford as the representative of the International Trust Company, which resulted in the preparation of a tentative agreement, which, with a modification afterwards to be mentioned, became the contract which is the basis of the present suit. Mr. Shackleford's testimony in respect to the tentative agreement is, omitting immaterial matter, substantially as follows:

"In the early part of August, 1909, Mr. Bradley came to my office and stated that they would like to acquire what is known as the lower water right and power plant and millsites on Sheep creek. That plant was in a state where it could be used, but it hadn't been in use for two or three years, the title to the Sheep creek mines having been in dispute, and after some discussion I informed him that I didn't think he was prepared, from his offers, to pay a price that would be attractive to the owners of the property, and he finally outlined an agreement which he called a—I have forgotten the exact term. It is a flood-water agreement, and it was practically in the form that it is now. So within two or three days, some time prior to the 10th of August, his representation at that time was that he was willing to insure to the International Trust Company and the parties interested in that property or in the Sheep creek mines sufficient power to operate the Sheep creek mines, and I told him that I thought a contract along that line giving adequate power for the operation of the mine might meet with the approval of the Boston bondholders and of the trust company. He estimated that we would need at least 150 horse power to operate the mines with; that was not to start the machinery but to operate the mines with, and he said that he thought 200 horse power would be a liberal estimate for the power continuously required in the operation of the mine. The contract was a draft of our ideas about the matter, so far as we had gotten, involving a lease during the period of the construction and an option to take the horse power, and an option in the case we didn't at the end of ten years take the horse power, was drawn up and various alterations in it were made. I drew a skeleton of the option, and after that time the option was either drawn or dictated by Mr. Bradley or Mr. Taylor. The option probably will be—the original draft is probably—in my handwriting very largely. As both the gentlemen suggested alterations and changes I would note them. The option, or the contract I should say, wasn't signed by either of the parties at that time. It was simply a draft for submission in Boston, drawn up here in Juneau and at Treadwell. After it was completed, I will say that the last clause in the option defining an uninterrupted current was drawn by me. I originally used the word 'continuous' instead of 'uninterrupted,' and it stood in the contract, I think, until we got on a boat. We went down below together. At that time it was changed to the word 'uninterrupted' at Mr. Taylor's suggestion because he said continuous had a meaning in electricity which might require them to deliver a direct—at any rate, that word was changed. However, when the contract was

completed, Mr. Bradley wrote a letter to Mr. Henry Endicott, who was the most influential bondholder in the—under the mortgage deed of trust, held by the International Trust Company, and who represented most of the other bondholders, and I took that letter with me and a draft of the contract. The original of that letter is in Boston. I have a copy, however, which I have examined, and which I know to be a correct copy, and I will present the letter in connection with my testimony. Upon my arrival in Boston I presented to them the draft of the contract, and the matter was discussed between the three principal bondholders and myself, Mr. Henry Endicott, Mr. William Endicott, and Mr. Wallace Hackett; and they asked me if I considered 200 horse power adequate, and I told them that was a subject upon which I declined to advise them because I had no technical knowledge of the requirements of the plant. I could tell them there was a 30-stamp mill there and about the machinery that was there. At that time Mr. Thane (an electrical engineer as the record shows) was in Boston, and they took the matter up with him and asked him. After consulting with Mr. Thane, he advised them that they would require 300 horse power in continuous use to operate that mine. Thereupon Mr. Henry Endicott sent a wire to Mr. Bradley at Wardner, Idaho, a copy of which I present for identification and ask to be offered."

The letter from Bradley to Mr. Henry Endicott which was taken by Mr. Shackleford with the draft of the tentative agreement to Boston and the telegram just referred to are as follows:

"Treadwell, Alaska, August 10, 1909.

"Henry Endicott, Esq., 101 Tremont Street, Boston, Mass.—Dear Sir: We have been talking to Mr. L. P. Shackleford about your water right on Sheep creek this district and both he and ourselves have agreed upon what we consider an extremely fair proposition our concession have been drawn up in the shape of a document which Mr. Shackleford will present to you as it is now this Sheep creek water power is in jeopardy and can be taken at any time by adverse interests our proposed arrangement will preserve your rights while at the same time developing them and making the most use of them. I presume you are holding this water right for the value that it has had and may have in the future for working the Sheep creek mines and thirty stamp mill connected therewith estimating conservatively 150 HP. is all the power these mines and mills ever required for their past operations. The mill is amply large enough for the mine and surely two hundred H. P. will more than take care of future requirements if the proposition is at all acceptable to you we would begin immediate work thereby preserving your rights and returning you some monthly income the proposition provides amply time in which you could decide either to sell the property outright or take two hundred H. P. for the operation of the mines and mill, your very truly,

"F. W. Bradley."

"Boston, August 23, 1909.

"F. W. Bradley, Wardner, Idaho: Will lease power on terms proposed subject to consent trust company if three hundred horse power is substituted for two hundred. Henry Endicott."

Bradley replied to that telegram as follows:

"Henry Endicott: You may substitute three hundred for two hundred horse power may I cable Sup't Kinzie to begin immediate protection measure.

"F. W. Bradley."

Mr. Shackleford proceeds to state in his testimony, concerning which there is no dispute, that shortly after the receipt of the last-mentioned telegram:

"Mr. Hackett and I proceeded with the organization of the Oxford Mining Company, and the property theretofore held in trust by the International Trust Company was deeded to the Oxford Mining Company as soon as the

president of the trust company returned from Europe and as soon as this was done the contract, as drafted or submitted by Mr. Bradley with his letter in August, was signed exactly as drafted and submitted except wherever the words two hundred horse' power had appeared in the contract originally the words three hundred horse power were substituted."

And the record shows without conflict that with that modification the contract already set out in full, and which forms the basis of this suit, was the tentative contract prepared by Bradley, Taylor, and Shackleford in August, 1909. Manifestly, in entering into that contract the parties were dealing at arm's length; there being no valid ground for saying that the International Company acted upon the suggestion of Bradley that 200 horse power would be sufficient for the operation of its properties. On the contrary, it is undisputed that that company took the advice of Mr. Thane in respect to the matter and acted in accordance with his recommendation in making the contract in question.

It also appears without dispute that the appellant corporations thereupon proceeded to erect a power plant upon the leased property generating from 2,600 to 3,000 horse power, and that the Oxford Company, the successor in interest of the International Company, and by it caused to be organized as already indicated, on the 31st of October, 1910—within a little over one year from the time of the execution of the contract—elected to take under the terms of the contract the electric current therein mentioned and stipulated for in lieu of the monthly rentals therein specified, and to convey all of the said property to the appellant corporations, which it did in April, 1911.

The record further shows that on the 1st of June, 1912, the appellee corporation, complainant below, succeeded to the interest of the Oxford Company, and on November 8th of the same year applied to the appellant corporations for such connection with their lines as would give to the appellee what was required by the contract; and, in compliance with such request, the appellant companies furnished the appellee an uninterrupted current capable, with proper appliances, according to the evidence, of yielding 300 horse power, and installed at their power house on the premises mentioned an instantaneous circuit breaker which broke the current whenever the latter exceeded that amount.

The provisions of the decree appealed from, hereinbefore set out at large, were the result of these views of the court below as expressed in its opinion:

"The contract is to be construed, if possible, in the light of the intention of the parties to the instrument as it appears, not only in the contract, but also from the evidence before the court in so far as it shows the surrounding circumstances of the subject of the contract, the relationship of the parties as it existed at the time of the execution of the same; the object to be accomplished under the agreement; the use of the subject-matter when discussed and known by both parties, and the manner in which it was to be used.

"First and most naturally we scan the language of the contract, and if its terms are unequivocal and no ambiguity exists, either in the words employed or in inconsistencies between different paragraphs with reference to the same subject-matter, then the contract speaks for itself.

"It is claimed that the failure to mention in the contract surges or peaks results that it was not contemplated at the time of the agreement, nor its

use anticipated. The evidence leaves little doubt that the necessity of start-ing surges or peaks was not anticipated or thought of, at least at the time of the execution of the contract. It therefore follows that the first question under the issues must be decided upon the fact that neither party to the con-tract thought of or anticipated the necessity or use of the surge or peak, now acknowledged to be necessary to start the kinds of motors then in use at Sheep creek, and which both parties would naturally expect would be em-ployed to entitle and permit the plaintiff to utilize the current contracted for.

"That means the use of induction motors employed when a current of 300 horse power is being utilized for general mining purposes. Form K Gen-eral Electric motors had been generally used in Alaska, and was naturally in the minds of the contracting parties at the date of the contract. At the time the contract was executed, the machinery operated by the power at the Sheep creek mines was not in operation, the Sheep creek mines not being then work-ed and had not been for some time, yet it is apparent that both parties to the contract had in mind at that time the reservation of sufficient horse power electric current on the part of the plaintiff's predecessor in interest to success-fully operate the said property as a mine.

"At that time there was still located on the Sheep creek properties, and formerly operated there, a 30-stamp mill, two rock crushers, two air com-pressors, two hoists, and about 100 electric lights.

"While the situation of the plaintiff's predecessor in interest was that of one embarrassed about maintaining the title to the water power in question, in that the law demanded the plaintiff's predecessor to continue to put to beneficial use the water at the Sheep creek power plant, which might be at any time relocated by other interests, it was also a valuable asset to the de-fendants to obtain additional power there to generate electricity, to be util-ized by them in their adjacent large mining operations in the vicinity where the water power had been already largely developed and utilized.

"No doubt under the testimony plaintiff's predecessor did not at the time of the contract so much intend to operate the Sheep creek mines with the electric current reserved under the contract, as they hoped it would prove an asset and inducement in offering for sale their Sheep creek property as a whole.

"At any rate, there is no question but that the reservation of the 300 horse power electric current was to enable the Sheep creek properties as a mine to be successfully operated.

"The parties first began the negotiations which resulted in the contract, Shackleford, Bradley, and Taylor, at Juneau and Treadwell, Alaska, in Au-gust, 1909, L. P. Shackleford at that time representing the International Trust Company and afterwards the Oxford Mining Company, its successor in inter-est, F. W. Bradley, consulting engineer of the defendant companies, in charge of their operations, construction, and development in Alaska, and H. H. Taylor, the then president of the defendant companies.

"At that time these gentlemen were familiar with the machinery then situ-ated on the Sheep creek property, as well as the power necessary to operate the same and the purposes for which the machinery would be employed.

"There is testimony that they estimated the power necessary to be reserved for the purposes of the plaintiff's successor in interest, to be not over 150 horse power, and they added 50 horse power for good measure, estimating the amount of power to be reserved by the plaintiffs at 200 electric horse power. However, Shackleford reserved the right to submit the amount of power to be reserved under the contemplated contract to his clients, and with the ten-tative draft of the contract and the letter from Bradley to Endicott about the same in his possession, he submitted the same to the officers of his corpo-rations he then represented, in Boston, and the amount of 200 horse power was not found by them sufficient or at least not satisfactory, and the tele-gram was sent to Bradley, in Idaho, that the tentative contract would be ac-ceptable if 300 horse power were inserted where the figures 200 horse power then appeared.

"At this point there was a meeting of the minds of the contracting parties on the subject-matter now before the court, and the only alterations made in

the original draft of the contract prepared by Shackleford, Bradley, and Taylor were the necessary changes of the term '200' to '300' wherever the former had been employed in the original.

"To further follow the evidence, in order to ascertain the intention of the parties contracting for the electric current reserved under the contract, we revert to the following:

"Bishop, formerly employed at the Sheep creek mines and power plant, testifies that the power necessary to run the machinery situated on the Sheep creek property when it was last operated prior to the contract shows that there was employed in the operation and development of the mines: 1 straight line air compressor, 14-inch cylinder, 16 or 18 inch stroke; 1 duplex air compressor, 16-inch cylinder, 16-inch stroke; 1 80 horse power Westinghouse 500-volt electric generator, direct current; 1 25 horse power Sprague 500-volt direct current generator; and a 75 horse power Sprague generator.

"At the mill was installed a 50 horse power C. & C. motor, a 50 horse power Sprague motor, also a 25 horse power motor, which ran the rock crushers.

"These motors were employed to run a 30-stamp mill, rock crushers, air compressors, hoists and about 100 lights installed in and about the buildings and mine.

"At the conference held by Shackleford with his clients in Boston at the time was one B. L. Thane, who was called into consultation by the plaintiff's predecessor and being familiar with the properties at Sheep creek and the machinery situated thereon and its use, advised that 300 horse power was necessary for its successful operation. Wallenberg, an electrical engineer employed by the plaintiff company, testifies that the amount of power required to run the machinery situated on the Sheep creek properties in 1909 was as follows:

"Running a mill of 30 stamps, 50 to 60 horse power; 2 rock crushers 25 horse power; 100 lights 10 horse power; 2 hoists 15 horse power; 2 pumps 10 horse power; the air compressors 75 horse power. That the power necessary to operate the equipment at the mines was as follows: For the use of the 2 air compressors 165 horse power; one generator 80 horse power; 1 25 horse power generator—or 370 horse power.

"Kinzie, manager for the defendant companies in Alaska, at Juneau, testified that he was acquainted with the machinery on the Sheep creek properties in 1909; that it could have been operated with a 200 horse power current if proper machinery had been installed.

"This leaves but one conclusion, and that is irresistible, that the parties to the contract knew at the time of the execution of the contract that the machinery then on the Sheep creek property could not be successfully run on a 200 horse power electric current, without the aid of other machinery; that is, a different equipment than had been employed.

"Mr. Kinzie's testimony, and he is corroborated by all the other witnesses called on the point, is that the General Electric Form K motor requires at least three or four times the starting surge it requires to operate its load; many of the witnesses testifying that it requires nine times the electric current to start such a motor that it does to operate it under its normal load.

"It seems apparent that the parties to the contract had in mind, when contracting for the current in 1909, the use of the usual machinery employed at Sheep creek and similar means for the mining and development of such a property and the power necessary to operate the plant then at Sheep creek and generally used in similar ventures.

"There can be no doubt but that with the amount of power to be utilized and the purpose for which it was to be used a General Electric Form K motor was anticipated; it being the most popular and practical motor of the size to be employed in connection with the power or current and the motor requiring the least care and experience in operating it.

"It is therefore to be concluded from the situation of the parties to the contract that it was their intention that the power to be reserved under the contract was for the purpose of operating the Sheep creek properties, employing at least such power in its future operations as had been employed in

the past, and that the usual induction motors used in similar operations would also be employed here; that at least over 200 horse power had been so employed and without the right under the surrounding circumstances to a starting surge the plant could not have been operated. The development in electrical starting appliances since 1909 must be taken into consideration when looking at the intention of the parties as portrayed in the contract of 1909."

[1, 2] It is quite true that in construing the written contract of parties it is proper for the court to consider the character of the property embraced by it and the situation of the parties at the time of making it; but that is permissible solely for the purpose of aiding in the true construction of the written instrument, and not for the purpose of adding to nor taking from any of its provisions—the latter never being permissible. But that is exactly what has been done by the decree in this case. Turning to the written contract, it is seen that what the appellee's predecessor in interest agreed to take and what the appellant companies agreed to deliver to it and its successors in interest was "a current of not to exceed three hundred (300) electric horse power, which shall be taken from and at the generating plant to be installed upon the leased premises" by the appellant companies. There is nothing in the written contract requiring the latter to deliver power. Indeed, that is expressly conceded in the brief of the appellee's counsel, where it is said:

"Certainly no one contends that anything was to be delivered other than current, but [they add] the question still remains open as to the quantity or volume of that current."

The difficulty in the way of the latter suggestion is that the written contract does not leave open the question as to the quantity or volume of the current, for it expressly declares it to be "a current of not to exceed three hundred (300) electric horse power." And yet by the decision of the court below there is in effect read into the written contract a provision requiring the appellant companies to furnish such additional current as may be necessary to start a certain kind of motor called the "General Electric Form K," which, the court below finds, all of the testimony shows "requires at least three or four times the starting surge it requires to operate its load," and that many of the witnesses testified "that it requires nine times the electric current to start such a motor that it does to operate it under its normal load." It is manifest that whether the starting surge is needed 10 seconds or 30 seconds or only 1 second, if the contract requires the appellants to furnish it, they are obliged to have it constantly available for the appellee's use and therefore cannot divert it to other uses without liability for damages. To read by construction into the written contract of the parties such a requirement is therefore to read into it a most important provision not there found. It is expressly stated by the court below in its opinion "that the necessity of starting surges or peaks was not anticipated or thought of" at the time of the execution of the contract; and the evidence in the case justifies that statement. How, then, can a court by its decree read into the contract a provision requiring one of the parties to furnish something that neither of the

parties to it ever thought of or contemplated? To state the question is to answer it in the negative.

The appellant companies by the written contract agreed to furnish a certain specified quantity of uninterrupted electric current, which the evidence shows they have done; the development of power from that current was and is a matter for the appellee company over which the appellant companies have under the contract no control or concern. And we can see no just or legal ground upon which any court can read into the contract between these parties a requirement that in addition to a current of not exceeding 300 horse power the appellant companies shall also furnish such additional current as may be needed to start the old motors that had been used by the predecessor in interest of the appellee several years before the making of the contract, or any other specific kind of motor.

It results from what has been said that the judgment must be and hereby is reversed, with directions to the court below to dismiss the suit at the cost of the complainant; appellants to recover their costs in this court.

GILBERT, Circuit Judge (dissenting). The facts in the case as found by the court below are, in substance, the following: In August, 1909, a representative of the appellants approached the attorney for the International Trust Company, the predecessor in interest of the appellee, and stated that it was the desire of appellants to secure possession and control of the Sheep creek power plant, then owned by the trust company, and construct upon the millsites, upon which said power plant was situated, a water power plant of substantial size and efficiency of a capacity to produce 3,000 horse power, and in exchange for said property to provide for the International Trust Company sufficient power to operate its mines known as the Sheep creek mines; and he represented that an uninterrupted current of 200 horse power continuously at the disposition of the said trust company would be sufficient for that purpose, said representation referring only to the ordinary electric load necessary to the operation of the mines and the mining machinery, and not including any estimate of the power momentarily necessary to start machinery that would consume such power. Thereafter the parties agreed upon a contract substituting 300 horse power instead of 200 horse power, of which the trust company had ascertained that it would need the continuous use. The matter of surges momentarily necessary to start machines was not discussed between the contracting parties, and no reference was made thereto in the contract; but from the surrounding circumstances it appeared that it was the intention of the parties to provide for the beneficial and uninterrupted use of 300 actual horse power to the trust company, including starting surges, which would insure the right to use such horse power in connection with the ordinary machinery used in mining and the ordinary forms of induction motors in common use in mining for loads of 300 horse power or less.

The court found that, for loads of 300 horse power or less, induction motors having an inherent phase of displacement and power factor

less than unity were in ordinary and practical use and were contemplated by the parties at the time of the execution of the contract, and that the power contracted for was 300 actual horse power as distinguished from 300 apparent horse power. The court further found that in making the contract the predecessor in interest of the appellee had a right to rely upon the representations made by the appellants to the effect that it was their purpose to furnish the amount of power stipulated in the contract in real, actual, and practical working efficiency, together with such momentary surges, as were necessary to start the machinery. And the court found that arrangements for the development of the appellee's mining property were made in reliance upon the contract of the appellants that they would furnish an uninterrupted current of 300 electric horse power for its actual and practical use, and that, relying upon said contract, a large force of men was engaged for underground development, and a large sum of money was expended upon said mining property; and that from November 8, 1912, to December 2, 1912, power was furnished the appellee under such understanding, but that from and after December 24, 1912, when the mine was shut down for Christmas day, the appellee has been unable to start the machinery with the current provided by the appellants except under the orders of the court, and that after said date the appellants refused to supply the surges necessary to start the appellee's machinery. The court found, also, that the starting of machinery which will consume a given amount of power often requires what is known as a starting surge, which lasts from 10 to 30 seconds, which from a practical standpoint is not taken into account or charged for in electrical connections; that in the Juneau mining district it is not customary for the appellants to charge any other customer for the necessary starting surges for machinery connected with their power plant, but the power is measured upon the amount taken after the machinery is started and in operation; and that it is the common practice, where a certain amount of horse power is normally used, for the producing company to allow a reasonable surge to the consumer sufficient to start and put in operation machinery which will normally consume the current provided for.

The court further found that, irrespective of the representations of the parties, it was the intention of the parties to the contract to provide for the actual and beneficial use by the appellee's grantor of a current of 300 real horse power, and that from the surrounding circumstances a starting surge was naturally to be implied or presumed, and that without a starting surge (in connection with K induction motors which the court found is the ordinary type of motor in mining use for loads of 300 horse power or less) the practical and beneficial use of more than 100 horse power could not have been obtained, and that under the conditions existing aforesaid at the time when the contract was executed the parties could not have contemplated the uninterrupted delivery of 300 horse power provided for in the contract unless a starting surge was implied in the said contract.

These findings of the court are amply sustained by the evidence in the case. Expert witnesses were called, who testified that, where the

use of a named amount of electrical horse power is provided for without further definition in a power contract, it is the practice and common usage of power companies to permit a surge whenever necessary so that the use may be enjoyed approximately to its full extent, and so that machinery of the ordinary inductive type may be put in operation at approximately the amount of horse power provided for in the contract; that a starting surge not to exceed half a minute is not construed as power in excess of that contracted for, provided that standard motors or apparatus are used.

The general superintendent of the appellants' plant, who was an electrical engineer, testified that the appellants furnished power also to the Alaska-Juneau Company with starting surges, and made no charge for starting surges and did not include the starting surges in its records.

Turning to the language of the contract, we find that it gives the appellee the right "to take a current not to exceed three hundred (300) electric horse power," that the appellants "undertake, covenant and agree to deliver said current," that the consideration for the contract is "the right to use the three hundred (300) electric horse power," and that the contract "contemplates the delivery of an uninterrupted current." It is not disputed that Form K General Electric motors had been universally used in Alaska at the time when this contract was made; and we are justified in assuming that it was in the minds of the contracting parties at the time of making the contract that such motors would be used in the mines to be operated by the appellee, and that the reservation of 300 horse power was for the purpose of effecting the successful operation of those mines. The evidence shows that said amount of current was necessary for that purpose. It was known that the K General Electric motor required at least three or four times, and possibly more, electric current to start than it did to operate it under its normal load, and that not more than 100 horse power could be used by the appellee without the starting surge. It is clear, also, that at the beginning of the appellee's operation under the contract the appellants so understood their obligation and gave that construction to the agreement. The causes which led them to change their view of their obligation are not disclosed.

It is a cardinal rule that in construing a contract the court must give effect to the intention of the parties. Language in the instrument which narrows the general purpose of the contract, and defeats a reasonable and just result, must be construed with reference to the known facts. In Western Lumber Co. v. Willis, 160 Fed. 27, 87 C. C. A. 183, this court, applying the rule announced in Chicago, Rock Island & Pac. Ry. Co. v. Denver & Rio Grande Ry. Co., 143 U. S. 596, 609, 12 Sup. Ct. 479, 36 L. Ed. 277, said:

"In the interpretation of a contract, the court may consider the relations of the parties, their connection with the subject-matter of the contract, and the circumstances under which it was made."

In Horgan v. Mayor of New York, 160 N. Y. 516, 55 N. E. 204, it was said:

"It is well settled law that the meaning of a contract is to be gathered from a consideration of all its provisions, and the inferences naturally derivable

therefrom, as to the intent and object of the parties in making it, and the result which they intended to accomplish by its performance."

When the contract here under consideration is viewed in the light of these rules for its construction, I can see no escape from the conclusion that the court below properly interpreted its terms.

That court correctly held, also, that the obligation to furnish a starting surge was implied in the contract which was made. The contract clearly contemplated that the appellee was to have the beneficial use of a current of 300 horse power. It contains a covenant that the appellants shall deliver that power. If to the use or the delivery of the specified power a starting surge was necessary, the promise to furnish it should be implied.

"A contract, it may be truly said, includes not only what the parties actually wrote down or said, but all those things which the law implies as part of it, and likewise all matters which both the parties intended to express, but did not." 9 Cyc. 252.

"Although a party does not in express terms undertake to do a particular act, a covenant to do it will be read into an instrument if from the text of the agreement, or the surrounding circumstances, it is manifest that the parties so intended." Patterson v. Guardian Trust Co., 144 App. Div. 863, 129 N. Y. Supp. 807; Booth v. Cleveland Mill Co., 74 N. Y. 15; Tuttle v. Woolworth, 74 N. J. Eq. 310, 77 Atl. 684; Creamer v. Metropolitan Securities Co., 120 App. Div. 422, 105 N. Y. Supp. 28.

The decision of the court below may be sustained, also, on the ground of the proven custom of companies which furnish electric current to permit a surge whenever necessary, under a contract to furnish a named amount of electrical horse power.

"Parties, who contract on a subject-matter concerning which known usages prevail, by implication incorporate them into their agreements, if nothing is said to the contrary." Robinson v. United States, 13 Wall. 363, 20 L. Ed. 653.

The construction given to the contract by the majority of this court brings about a result that was not contemplated by either party to the contract at the time when it was made and upon which their minds never met. By that construction the appellants receive judicial sanction to say, in effect, to the appellee:

"It is true that for a valuable consideration we covenanted with your grantor to furnish it a current of 300 horse power; and it is true that you cannot get what we promised unless we deliver it to you by an initial surge, but you are helpless and you can never use that which we agreed that you should have, for the reason that there is no express stipulation in the contract that we should furnish the surge. It is not so nominated in the bond."

The plain answer to that is that the parties contracted with reference to the known conditions and with knowledge of the fact that a surge was necessary in order to carry out the express provisions of the contract in accordance with the intention of the parties, and that a promise to furnish it was necessarily implied.

Where a contract is susceptible of a construction in accordance with justice and fair dealing, the court should adopt it. As was said in Noonan v. Bradley, 9 Wall. 394, 19 L. Ed. 757:

"When an instrument is susceptible of two constructions—the one working injustice and the other consistent with the right of the case—that one should be favored which standeth with the right."